Harolyn PAVAO, as Special Administratrix of the Estate of Jon Webster Pavao, Plaintiff–Appellant,

v.

John PAGAY;  County of Hawaii, Defendants–Appellees.

No. 01–15201.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 9, 2002.

Filed Sept. 30, 2002.

Eric A. Seitz, Honolulu, HI, for the plaintiff-appellant.

Joseph K. Kamelamela, Deputy Corporation Counsel, County of Hawaii, Hilo, HI, for the defendants-appellees.

Before: WALLACE, TASHIMA and TALLMAN, Circuit Judges.

TALLMAN, Circuit Judge.

## I

We must decide whether a police officer responding to two dropped 911 calls from a residence, which, as was later revealed, concerned an ongoing domestic violence incident, had consent to enter the home. Tragically, the incident resulted in the death of one of the participants, Jon Webster Pavao, who pointed a gun at the responding officer. Appellant Harolyn Pavao, as Special Administratrix of the Estate of Jon Pavao ("the Estate"), appeals the judgment entered in favor of Appellee Hawaii County Police Officer John Pagay. The Estate also challenges the order denying its renewed motion for judgment as a matter of law, or in the alternative, its motion for a new trial on its claim under 42 U.S.C. § 1983. The Estate contends that both the jury and the district court erred in concluding that Officer Pagay had received clear and unequivocal consent to enter the home on June 10, 1998. We affirm.

## II

Jon Webster Pavao ("Pavao") had been living with his girlfriend Linda Sadino ("Linda"), and her children in a home on the Island of Hawaii. On the afternoon of June 10, 1998, Pavao and Linda had an argument during which Pavao grabbed Linda's neck. During the course of the argument, one of Linda's children, Michelle Segobia ("Michelle"), who was approximately 14 years old at the time, twice called 911 but hung up both times before describing the nature of her emergency to the dispatcher. Meanwhile, Linda told Pavao to leave the home, and Pavao arranged for his daughter Sharina Pavao ("Sharina") to pick him up. Once Sharina arrived, she was invited into the home by Linda while Sharina's brother-in-law and a friend waited in a truck outside the residence.

Uniformed Police Officer John Pagay ("Officer Pagay") was dispatched to the home to investigate the dropped 911 calls received from that address. Officer Pagay had been told by the radio dispatcher that the caller sounded like a female child requesting police assistance, but that the reason for the calls for help was unknown. Upon arrival, Officer Pagay first approached the vehicle in which Sharina's brother-in-law and the friend were still seated. He asked whether there were any problems, and both responded that they did not know anything since they had just arrived at the home. Sharina testified that when Officer Pagay first pulled up, Linda looked outside and asked, "Who

called the cops?," which suggests that the inhabitants of the home were aware that Officer Pagay was present before he knocked on the front door of the residence.

Officer Pagay testified that on arrival he heard loud female voices coming from inside the residence. Upon reaching the front door of the residence, Officer Pagay opened the outside screen door. He knocked several times on the closed wooden door behind it, and announced his presence by stating, "Police." Officer Pagay then heard someone inside the residence shout, "Open the door, I think that's the police."

Michelle opened the wooden door about halfway, and stood next to the door with her hand on the back of the doorknob. Although Michelle claimed that she did not remember being questioned at the front door, Officer Pagay testified that while still standing outside he asked Michelle, "Is there a problem here? Did someone call 911?" Michelle provided no verbal response to Officer Pagay's questions. Officer Pagay testified that he observed a "terrified look" on Michelle's face and that it appeared as though she had been crying.

The conversation between Michelle and Officer Pagay lasted for approximately one minute. Thereafter, Michelle fully released the door by swinging it all the way open. Without comment, she stepped back against a sofa in the living room of the home and looked to her mother, Linda, who was standing near a hallway by the dining room. Still standing in the threshold of the doorway, Officer Pagay asked Linda if there was a problem and if anyone had called 911. Linda also failed to respond to these inquiries.

Officer Pagay then entered the home, without objection, and learned from Linda that Pavao had grabbed her by or near her neck. Once inside, Officer Pagay told the feuding parties that one of them would have to leave, and Linda informed Officer Pagay that Pavao was already leaving. At Officer Pagay's direction, Pavao proceeded to the kitchen to gather up his things. Officer Pagay then noticed Pavao remove a revolver from a drawer in the kitchen and place it in the waistband of his pants. Officer Pagay drew his weapon and ordered Pavao to drop his gun.

All witnesses agreed that instead of dropping his revolver, Pavao removed the gun from his waistband and then lowered it to his side with the barrel pointing towards the ground. All witnesses also agreed that, even after being repeatedly ordered to drop his gun, Pavao raised his revolver, pointed it at his own head, and challenged Officer Pagay to shoot him. When Pavao was again ordered to drop his gun, he lowered the weapon to his right side, with the barrel pointing towards the ground. During this exchange, Linda was repeatedly shouting to Officer Pagay that the gun held by Pavao was broken and inoperable, although Officer Pagay testified that he did not hear what she was saying at the time.

Conflicting testimony was presented to the jury regarding Pavao's actions and statements in the moments immediately preceding the fatal shooting. Linda, Michelle, and Sharina testified that Officer Pagay shot Pavao when Pavao was simply holding his weapon at his side, pointing it towards the ground. However, Officer Pagay testified that in lowering the revolver, Pavao had pointed it forward in the direction of Officer Pagay, and that Pavao smirked or smiled at Officer Pagay, took "two" or "several" steps forward, then raised his gun again and pointed it towards Officer Pagay. Officer Pagay shot Pavao in the chest, and Pavao died as a result of his gunshot wounds.

The Estate filed a suit for damages against Officer Pagay and the County of Hawaii under 42 U.S.C. § 1983, and the

**918**

case proceeded to trial. At the close of the evidence, the Estate moved for entry of judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). That motion was denied based on the district court's determination that the evidence presented created a question of fact as to whether clear and unequivocal consent was given to Officer Pagay to enter the home. On April 24, 2000, the jury returned its verdict in favor of Officer Pagay, specially finding that (1) "before entering the home ... Officer Pagay had received a clear and unequivocal consent to enter from [ ] the occupants," and (2) that "Officer Pagay had a reasonable belief that [Pavao] posed a significant threat of death or serious physical injury to [Officer Pagay] or others when he shot [Pavao] on June 10th, 1998."

The Estate renewed its motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) and, in the alternative, sought a new trial, arguing that (1) there was insufficient evidence to support the jury's conclusion of clear and unequivocal consent, and (2) that the verdict in favor of Officer Pagay was against the weight of the evidence. On May 18, 2000, final judgment was entered in favor of Officer Pagay. On July 14, 2000, the district court denied the Estate's post-trial motions, finding that the jury's special verdict was supported by substantial evidence. The Estate timely appealed.

**III**

A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion. "[A]lthough

the court should review the record as a whole, it must disregard evidence favorable to the moving party that the jury is not required to believe, and may not substitute its view of the evidence for that of the jury." *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir.2001) (internal quotations omitted).

We review de novo the grant or denial of a renewed motion for judgment as a matter of law. Such a judgment is proper if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict. *See McLean v. Runyon,* 222 F.3d 1150, 1153 (9th Cir.2000).

The grant or denial of a motion for a new trial is reviewed for an abuse of discretion. *See Johnson,* 251 F.3d at 1229. A trial court may grant a new trial only if the verdict is against the clear weight of the evidence, and may not grant it simply because the court would have arrived at a different verdict. *See Silver Sage Partners, Ltd. v. City of Desert Hot Springs,* 251 F.3d 814, 818–19 (9th Cir.2001).

Regardless of which standard of review is applied in this case, we hold that the district court did not err when it refused to overturn the jury's decision that consent could be implied from the totality of the circumstances surrounding Officer Pagay's entry.[1]

**IV**

**A**

In a criminal case, the government bears the burden of proving by a prepon-

---

1. As an initial matter, the Estate asserts that the district court erred in submitting the consent issue to the jury when it should have decided the issue itself as a matter of law. We see no error in the district court's submis-

sion of this factual determination to a properly instructed jury, and the Estate has not challenged the adequacy of the instructions given to the jury.

derance of the evidence that consent was freely and voluntarily given. *See Rosi,* 27 F.3d at 412. In a civil case under 42 U.S.C. § 1983, however, the plaintiff carries the ultimate burden of establishing each element of his or her claim, including lack of consent. *Larez v. Holcomb,* 16 F.3d 1513, 1517 (9th Cir.1994); *accord Valance v. Wisel,* 110 F.3d 1269 (7th Cir. 1997).

We recognize that "every encounter has its own facts and its own dynamics," and "[s]o does every consent." *United States v. Morning,* 64 F.3d 531, 533 (9th Cir.1995). In determining whether consent was given in a particular case, we must therefore consider the totality of the circumstances. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 225–26, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Garcia,* 997 F.2d 1273, 1281–82 (9th Cir. 1993). "[I]t is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary." *Schneckloth,* 412 U.S. at 232–33, 93 S.Ct. 2041.

For instance, in *Garcia,* 997 F.2d at 1281, we concluded that the circumstances surrounding an officer's entry into the defendant's home justified a finding of implied consent. In that case, two officers initiated a conversation with the defendant by posing as prospective renters looking for an apartment. However, once the defendant opened the door to his residence, the officers immediately stated, "We're police officers, we'd like to talk to you." *Id.* at 1277. Garcia responded by saying, "Okay," and then nodded and stepped back. *Id.* We found that the "officers' request to talk, combined with Garcia's affirmative response and step back clearing the way for the officers' entry [was] sufficient to give rise to an inference of consent." *Id.* at 1281. The fact that "Garcia didn't have to step back to continue his conversation with the officers who were then outside the door" further supported that conclusion. *See id.*

In contrast, we declined to infer such consent in *United States v. Shaibu,* 920 F.2d 1423 (9th Cir.1990). After hearing his door-buzzer ring, Shaibu stepped into the hallway outside of his apartment where officers identified themselves and asked him if the suspect for whom they were searching was in his apartment. *See id.* at 1424. Without comment, Shaibu walked back into the apartment, leaving the door open, and the detectives followed him inside. *See id.* In doing so, "[t]he officers did not ask permission to enter Shaibu's apartment nor state their intention to do so, but simply followed Shaibu through the open door." *Id.*

We held that "in the absence of a specific request by police for permission to enter a home, a defendant's failure to object to [police] entry is not sufficient to establish free and voluntary consent." *Id.* at 1428. Unlike the conduct of the defendant in *Garcia,* "Shaibu did nothing that would have led the officers to believe that they had permission to step across the threshold into his residence." *Garcia,* 997 F.2d at 1281.

Similarly, in *United States v. Albrektsen,* 151 F.3d 951, 955 (9th Cir.1998), we again declined to infer consent where the defendant was forced to move away from the door so that the entering officer would not knock him down. We concluded that this action, designed to avoid a physical collision with the entering officer, could not be construed as providing consent. *See id.*

## B

The circumstances surrounding Officer Pagay's entry in this case were sufficient to support the jury's verdict that he was given clear and unequivocal consent to enter the home on June 10. Officer Pagay testified that he believed he had permis-

sion to enter the residence based on a combination of factors: (1) Michelle had initially opened the door halfway after Officer Pagay had heard a female state, "Open the door, it's the police;" (2) Officer Pagay was responding to dropped 911 calls for help placed by a young female from that residence and reasonably felt that at least one of the occupants expected him to come to the home; (3) the terrified look on young Michelle's face combined with her lack of response after approximately one minute of questioning indicated that something was amiss in the household; (4) the full opening of the door in conjunction with Michelle's suggestive body language in stepping back and out of the doorway indicated to Officer Pagay that Michelle was giving him permission to enter the residence; and (5) neither Linda nor any others present objected to Officer Pagay's entry into the home.

■ While it is true that "mere acquiescence to a claim of lawful authority" is by itself insufficient to allow an inference of voluntary consent, *see Shaibu*, 920 F.2d at 1426, the conduct of the occupants of the residence in this case constituted more than mere acquiescence. Michelle placed the initial 911 calls which prompted Officer Pagay's response, and the jury heard testimony suggesting that when Michelle answered the door, she was aware that the person on the other side was a police officer. For instance, Officer Pagay testified that the statements that he heard on his approach to the house indicated to him that the occupants were aware of his presence. Further, Officer Pagay had been speaking with Michelle in the doorway for approximately one minute without any indication on Michelle's part that she desired him to leave.

Thus, despite Michelle's silence, there is nothing in the record to indicate that Michelle's decision to fully open the front door of her home and step back into the living room was "mere acquiescence to a claim of lawful authority." On the contrary, the circumstances indicated that her actions constituted an implied invitation to enter the home. *See United States v. Griffin*, 530 F.2d 739, 743 (7th Cir.1976) (holding that despite the defendant's silence in response to police questions about a possible burglary at his residence, his conduct in stepping back and leaving the door open constituted consent to enter the home); *see also Robbins v. MacKenzie*, 364 F.2d 45, 48 (1st Cir.1966) (holding that "a policeman who identifies himself and his purpose from the other side of a closed door has every reason to assume that the act of unlocking and opening the door, without more, is a consent to talk, and that the walking back into the room is an implied invitation to conduct the talking inside").

Just as in *Garcia*, Michelle "didn't have to step back to continue [her] conversation with the officer[ ]." *Garcia*, 997 F.2d at 1281. Especially in light of the other factors surrounding Officer Pagay's arrival on the scene, this conduct could reasonably have led Officer Pagay to believe that he "had permission to step across the threshold into [the] residence." *Id.; see also Robbins*, 364 F.2d at 48 (holding that "[w]hen a householder, knowing the identity and purpose of his caller, opens his door and turns back inside, he expresses by his actions as adequate a consent to entry as he would by a verbal invitation"); *United States v. Turbyfill*, 525 F.2d 57, 58 (8th Cir.1975) (holding that "[t]here was no error in the determination of the district court that the action of[an occupant] in the opening of the door and stepping back constituted an implied invitation to enter").

Further, while the mere failure to object to an officer's entry is alone insufficient to allow an inference of consent, *see Shaibu*, 920 F.2d at 1427, the fact that none of the

occupants in the residence objected to Officer Pagay's entry lends further credence to the conclusion that Officer Pagay had received clear and unequivocal consent to enter the home. *See Griffin,* 530 F.2d at 743 n. 3 (lack of objection to the officer's presence inside an apartment after entry supported the court's conclusion that consent to enter had been provided).

We think it especially significant in our analysis of the consent issue in this case that, unlike *Shaibu* and *Garcia,* the officer here was responding to a possible 911 call for help from one of the occupants of the residence. *Compare Shaibu,* 920 F.2d at 1424–25 (where officers, without a warrant, went to defendant's apartment complex looking for a suspect whom they mistakenly believed resided in the apartment occupied by defendant), *and Garcia,* 997 F.2d at 1276–77 (where officers conducting an undercover drug investigation posed as prospective renters to gain better access to residence in question).

Thus, although Officer Pagay was not provided with a clear verbal statement granting him express consent to enter the home, clear and unequivocal consent to enter could be implied from the totality of the circumstances in this case. *See Schneckloth,* 412 U.S. at 226, 93 S.Ct. 2041 (noting that determination of whether voluntary consent is given requires "careful scrutiny of all the surrounding circumstances," and does not turn "on the presence or absence of a single controlling criterion").

There was substantial evidence to support the jury's finding that Officer Pagay received implied consent to enter the home. Thus, the plaintiff failed to meet her burden of establishing that the entry was unlawful and that any implied consent that may have been given was not voluntary. We cannot say the jury erred on this record.

**AFFIRMED.**