# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
         *Plaintiff-Appellee,*

v.

GO DADDY SOFTWARE, INC.,
         *Defendant-Appellant.*

No. 07-16190

D.C. No.
CV-04-02062-DGC

OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted
January 16, 2009—San Francisco, California

Filed September 10, 2009

Before: William A. Fletcher, John T. Noonan, and
A. Wallace Tashima, Circuit Judges.

Opinion by Judge William A. Fletcher;
Dissent by Judge Noonan

## COUNSEL

James M. Tucker, EEOC, Washington, D.C., for the appellee.

Fred W. Alvarez, Michael J. Nader, WILSON SONSINI, et al., Palo Alto, California, Lawrence Kasten, LEWIS & ROCA, Phoenix, Arizona, for the appellant.

## OPINION

W. FLETCHER, Circuit Judge:

Youssef Bouamama was terminated from his job at Go Daddy Software, Inc. ("Go Daddy"). The Equal Employment Opportunity Commission ("EEOC") brought suit against Go Daddy on Bouamama's behalf in federal district court. A jury

returned a verdict in favor of the EEOC on the claim that Bouamama had been unlawfully terminated in retaliation for engaging in protected activity.

Go Daddy moved in the district court for a judgment as a matter of law under Federal Rule of Civil Procedure 50(b), arguing that there was insufficient evidence that Bouamama engaged in protected activity; or, if he did engage in protected activity, that there was insufficient evidence that there was a causal connection between that activity and his termination. In the alternative, Go Daddy moved for a new trial under Federal Rule of Civil Procedure 59(a). The district court denied both motions. We affirm.

## I.  Background

Go Daddy is a for-profit corporation that assists individuals and companies in registering domain names on the Internet. Go Daddy operates a call center from which employees provide sales and technical support to customers over the telephone. Go Daddy also has a Tech Support/Web Board department that responds to customer requests over email.

In September 2001, Bouamama, a Muslim of Moroccan national origin, interviewed for a job at Go Daddy. Brett Villeneuve, a supervisor in the call center, participated in the interview. Go Daddy hired Bouamama on a temporary basis as a Technical Support Representative in the Tech Support/Web Board department. Bouamama began working on September 20, 2001, for $12 per hour.

Shortly after Bouamama was hired, Villeneuve became the operations manager of the call center, which meant that he was in charge of the employees in both the call center and in the Tech Support/Web Board department. Villeneuve testified that although Bouamama was assigned to the Web Board, he occasionally answered calls for the call center. Some customers complained about Bouamama's manner on the phone.

Nevertheless, on December 13, 2001, Villeneuve converted Bouamama to a full-time, regular employee, raising his wage to $14 per hour, and providing him with medical, dental, and disability benefits, and paid vacations and holidays. At trial, Villeneuve described Bouamama as "a good rep . . . . [T]echnically knowledgeable. His typing skills were good. He put out good, solid answers."

Between December 2001 and February 2002, Villeneuve overheard Bouamama speaking to a customer in French. Bouamama testified that "after I finished with the customer [Villeneuve] was asking me about . . . where I'm from and what language I was speaking and what, you know, religion I was practicing." Bouamama testified that he told Villeneuve that he was a Muslim from Morocco who spoke Arabic. He also testified that he "really didn't feel that it was appropriate to ask me this kind of questions but in the meantime, you know, I want a job, we were at war, so I just let it go."

Villeneuve remembered the conversation differently. He testified that overhearing the phone call with the customer was "pretty cool . . . . [W]hen the phone conversation ended, I asked him — I verified that it was French. I thanked him for . . . helping out the customer. I asked him if there were any other languages that he spoke." Bouamama responded that, in addition to English and French, he spoke Arabic. Villeneuve testified that it was a "huge help" to have a representative who spoke other languages. When asked whether Bouamama seemed upset by the question about what languages he spoke, Villeneuve testified, "No, not particularly . . . . [H]e was kind of smiling like he was proud of the fact [that] . . . he's trilingual. That's neat."

In 2002, Villeneuve created "Team Lead" positions. In addition to handling sales and support inquiries from customers, each Team Lead supervised a crew of sales representatives. Bouamama applied to be a Team Lead, but, according to Villeneuve's testimony, he was initially denied the position

because of "his abruptness with people, his demeanor, his abrasiveness." Villeneuve testified that Bouamama complained, and that Villeneuve reversed his position, promoting Bouamama to Team Lead on February 25, 2002. Bouamama's wage was increased to $16 per hour.

Shortly after Bouamama was promoted to Team Lead, the position of Inbound Sales Manager became available. Four or five people, including Bouamama, applied for the position, and Villeneuve gave the position to Bouamama. The promotion took effect on July 11, 2002. In this new position, Bouamama was responsible for preparing reports and for tracking phone calls, sales by individual employees and teams of employees, and sales of different Go Daddy products. Bouamama's compensation was increased to $46,000 per year plus bonus. Bouamama testified that he often worked weekends, without being asked and without being paid overtime or requesting to be paid overtime, so that he could keep up with the demands of the new position.

Bouamama testified that after his promotion to Inbound Sales Manager he complained to Heather Slezak, who worked in Go Daddy's Human Resources Department, about his conversation with Villeneuve that had occurred about six months earlier when Villeneuve overheard Bouamama speaking to a customer in French. Bouamama testified that he could not recall if Slezak promised to speak to Villeneuve about this, or if she said something like Villeneuve "is the way how [he] is, don't worry about him, he don't really mean stuff." According to Bouamama, neither he nor Slezak followed up on this. According to Slezak, Bouamama never complained to her about Villeneuve.

Bouamama testified that, in addition to his comments made following Bouamama's conversation in French, Villeneuve made at least one other discriminatory comment in his presence, saying, "The Muslims need to die. The bastard Muslims need to die." Villeneuve was talking to other employees in the

hallway near Bouamama's cubicle when he made this comment. Bouamama testified that he did not respond to Villeneuve or complain about him because "[w]e were at war . . . . After September 11 things changed, people are hurt, you know, I was hurt . . . and, you know, you try to be compassionate. I understand maybe the anger that some people are expressing . . . ." Bouamama testified further that he did not complain because "[t]here's a culture in Go Daddy. You complain you get fired."

On April 1, 2003, Go Daddy hired Craig Franklin from an outside company to be Director of Call Center Operations. Franklin had 20 years of experience in call centers and had supervised 1,500 employees in his prior job. Villeneuve, who had previously managed the call center, was demoted. He was no longer a member of Go Daddy's Executive Staff, and he lost the authority to hire and fire workers without approval. Villeneuve reported to Franklin.

On his second day on the job, Franklin reorganized Go Daddy's call center. He testified that in planning the reorganization, he did not solicit advice from Villeneuve or Slezak. Franklin decided to eliminate thirteen Team Lead positions, the Weekend Sales Manager position, and the Inbound Sales Manager position held by Bouamama. Franklin testified that he did not examine the competencies of any of the individuals holding the positions before he decided to eliminate them. Franklin created four new Sales Supervisor positions that employees, including those whose positions had been eliminated, could apply for.

On April 4, 2003, Franklin, Villeneuve, and Slezak met with Bouamama and informed him that his position was being eliminated. According to Bouamama, he was told that he could apply for one of the new Sales Supervisor positions or "walk away." When asked what he understood the phrase "walk away" to mean, Bouamama testified, "Well, somebody repeat that five times to you it means quit on your own. That's

what it means." During cross-examination, Bouamama was asked again if he had been told what would happen if he "didn't apply for the [new] position or if [he] didn't get the position." Bouamama responded:

> A: Yes, sir.
>
> Q: You were told you could take a position back on the floor, answering the phones, or you could accept a severance package.
>
> A: Accept a severance package?
>
> Q: Isn't that what they told you?
>
> A.: No. They told me that, you know, you can apply for this position and — you know, or you can walk away.

This testimony by Bouamama about his options conflicts with the testimony of others. Villeneuve testified that employees who applied unsuccessfully for the Sales Supervisor positions "had two options. If you didn't get the position, you could go back to the phones, with a — we changed your pay rate so they weren't starting out at base all over again. We increased their pay based on tenure . . . . If you chose not to go back to the phones, you could leave the company, and we had a severance package for everybody." Franklin testified similarly, stating that "we encouraged" applicants who did not get the Sales Supervisor position "to go back to the phones."

During the morning of April 7, 2003, Franklin stopped by Bouamama's cubicle. Bouamama testified as follows:

> A . . . . I was working on my cubicle, Mr. Craig Franklin show up around like 8:30, nine o'clock in the morning and he came around me and he saw some pictures in my cubicle and trouble with the

conversation started with where are these pictures from, and I said Morocco, and he said, "Are you from Morocco?" I said, "Yes." He said, "Are you Muslim?" I said, "Yes."

And by the time I was going to engage the conversation with him I kind of like look at him in the face why he's asking me these questions and he looked at me and he said, "You know, you're lucky that I like you," and he walked away to his desk.

Q. So you didn't say anything in response?

A. I didn't get a chance to talk to him.

Q. Did you have any statistical information in your cubicle that Mr. Franklin was there to obtain?

A. Mr. Franklin, you know, he's the new director of the Call Center. He has access [t]o any information he wants to without really asking me. As a matter of fact, I volunteered to give him an update about the department. He cancelled three times the meeting.

Q. So he could have obtained statistical information from other locations, is that right?

A. That's correct.

Franklin recalled the conversation differently. He testified that he saw the pictures and remarked that they were beautiful and asked where they were from. Bouamama told him that they were from Morocco. Franklin testified that he did not ask Bouamama where he was from or what religion he practiced. He further testified that Bouamama did not volunteer that he was a Muslim and that he, Franklin, had not said, "You know, you're lucky that I like you."

Bouamama testified that during the afternoon of April 7, after the exchange with Franklin, he complained to Slezak in the Human Resources department of Go Daddy:

Q.   What did you tell her?

A. I told her that this is the second time that people are concerned and taking interest about, you know, where I'm from, my religion. You know, I can understand that it was happening with [Villeneuve] but this guy here [Franklin], I don't know him and two days ago he came and telling me that he doesn't care about my history and he wanted to eliminate my position. The next day he's taking interest for who I am and where I'm from. So I wanted her to look into it. She said that she will look into it.

Q. So you told — you told her this was the second time that somebody had complained — had made comments about you?

A. That was, I would say, the second or third time that I spoke to her about some matters like that.

Q. So you had gone to Miss Slezak to complain about comments about your national origin and religion before?

A. That's correct.

Slezak denied that Bouamama ever complained to her.

On April 9, 2003, Franklin, Villeneuve, and Slezak interviewed Bouamama for one of the Sales Supervisor positions. The panel interviewed thirteen other candidates during that day and the next. The panelists unanimously agreed to hire six of the candidates, two more than Franklin originally planned. Bouamama was not among those hired. According to Ville-

neuve's testimony, Bouamama ranked "[l]ower, towards the bottom of the frame" compared to other candidates. Villeneuve also testified that neither religion nor national origin played any role in the panel's decisions.

Slezak testified that the panel met with Bouamama on April 14 and told him that he did not get a Sales Supervisor position. According to Slezak, "We thanked him for his time, encouraged him to stay with the organization because there would be opportunity in the future, and presented him the same options to retain a position . . . or take a severance package and leave the company." This is consistent with the testimony of Villeneuve and Franklin that Bouamama, like other unsuccessful candidates, had the option to "go back to the phones." According to Slezak, "all of the unsuccessful candidates, aside from Mr. Bouamama, selected right then and there to retain a position with the company as an inbound Sales Representative." According to Franklin, Bouamama said "I'm not going back to the phones." Slezak testified that the panel gave Bouamama two days to make a final decision.

Bouamama testified that the purported meeting with the panel on April 14 never took place. He testified that he learned that he did not get the Sales Supervisor position directly from Bob Parsons, Go Daddy's CEO, on April 14. According to Bouamama, Parsons called him into his office, told him that he did not get the Sales Supervisor position, and told him that he would be doing "sales statistics" for the company. Bouamama testified that Parsons said, "I don't want you [to] worry about what's going on in the sales department[,] and I want you to be my ears and my eyes for the company." According to Bouamama, "[m]y understanding was that [I would] wait two weeks for the transitions and help [Franklin] and all the others as to . . . what they need[ed] to do on the department and then I will be moving to another department doing statistics, sales or statistics analysis."

Parsons' testimony was inconsistent with Bouamama's. Parsons testified that Bouamama called him to express his

disappointment at not getting the Sales Supervisor position. Parsons testified that he promised Bouamama that he "would see what I could do." He further testified that he explained to other executives that he thought Bouamama "was a good employee" and that "because of — of his personality issues, with his abrasiveness, particularly with female employees, that maybe a supervisor position for now was not a good idea for him, but maybe there was something else in the company." He testified that another executive, Barbara Rechterman, mentioned that she was planning to create a marketing analyst position, and she and Parsons agreed that Bouamama, who had a background in mathematics, might be a good fit for it.

Bouamama testified that at the end of the day on April 14, he passed Franklin's office on the way to the parking lot, and "the first thing that [Franklin] said is come here, the F word. You know, I look at him like, 'What?' And he said, 'Come here.' " According to Bouamama, Villeneuve and Slezak were in the room. Bouamama testified that he responded, "Hey, you know, I just spoke to Mr. Bob Parsons" and that he then went home.

Bouamama testified that on the morning of April 15, 2003, he met with Rechterman to discuss the marketing analyst position, and that she asked him to write a report "related to sales product and cost" and to deliver it to her by noon. He further testified that he emailed her a "preliminary report" around 11:30 and asked if it was satisfactory. Rechterman did not respond. Bouamama sent her a final report around 2:30, and again she did not respond. Bouamama testified that he went to Rechterman's office at about 3:00 to inquire about the report, and that the first thing she said was "I don't know [why] they send you to my department. You need to go ask Mr. Craig Franklin why you didn't get the Sales Supervisor position." Bouamama testified that he went to speak to Franklin, whose first words were, "Oh, I thought I took care of you." He testified that Franklin said he had to talk to Rechterman. Bouamama testified that he had been at work for ten

hours at that point, and that he responded, "I'm tired of all this, I'm going home."

Rechterman recalled her interaction with Bouamama differently. She testified that she gave Bouamama a project involving "conversion rates," which were the "basis of the analysis in [her] department," and that she explained the project to him twice, initially and when Bouamama came back to her with questions. She testified that she did not give him a deadline and that it was "not a difficult project at all." She further testified that Bouamama's final product was "inaccurate" and "wrong" and that she told him that she "didn't think it was going to work out for him in an analytical role."

On the morning of April 17, 2003, Bouamama called in sick and went to the EEOC. Bouamama testified that he "was there to find out what are my rights . . . . I went to EEOC to find out there is something that is going on to me, do you think that this company is doing something wrong or not?" On a questionnaire asking him to describe the harm for which he was filing a complaint, Bouamama wrote, "in process of being demoted or choice to walk away. [B]een asked so many time[s] [w]here I am from and [w]hat religion I practice." After completing the questionnaire, Bouamama had a two-hour interview with an EEOC investigator.

Bouamama testified that he went to work on the afternoon on April 17, 2003, in response to a telephone call from Slezak, who said "there is something urgent that we need to talk about." He met with Slezak and Franklin. According to Bouamama, Slezak said, "You did not get the Sales Supervisor position and you're not going to go back to the floor." He testified that she continued, "This is how it is . . . effective today immediately. You are no longer with the company." He testified that Slezak offered him the severance package. When asked whether Slezak or Franklin offered him the sales representative position — i.e., a return to the phones — Bouamama testified, "No. They never did." When asked if he would have

taken such a position if it had been offered to him, Bouamama testified, "I will. I'm not a quitter. I will go back to the floor and I will prove myself again and I will pro[ve] them wrong." When asked if he left his job voluntarily, he testified, "No, I did not."

On or before April 29, 2003, Bouamama signed an EEOC "Charge of Discrimination" form. He stated on the form, *inter alia*, that "[o]n April 7, 2003, I was again asked where I was from, my religion and what languages I spoke. I was told that if I was not selected for a supervisory position I could 'go back to the beginning' (meaning I could demote to my original sales position), or I had a choice to 'walk away.' " When asked at trial about the EEOC questionnaire he filled out on April 17 and the Charge of Discrimination form he filled out on April 29, Bouamama stated, "I told [the EEOC investigator] that on my initial . . . first meeting with [Slezak], [Villeneuve] as when they called me they going to eliminate my position I have a choice to apply for it . . . or walk away or go back to the floor." Both the questionnaire and Charge of Discrimination form were introduced into evidence.

The EEOC brought suit against Go Daddy in federal district court on Bouamama's behalf, making essentially two claims — a discrimination claim and a retaliation claim. First, it claimed that religion and/or national origin was a motivating factor in Go Daddy's decision not to promote Bouamama to Sales Supervisor and in its later decision to terminate him. Second, it claimed that Go Daddy failed to promote Bouamama to the position of Sales Supervisor and later terminated his employment in retaliation for engaging in protected activities.

After closing arguments, outside the presence of the jury, Go Daddy made an oral motion under Rule 50(a) for judgment as a matter of law. In its entirety, the motion was:

> With regard to the Commission's discrimination claims, Go Daddy believes there's no legally suffi-

cient evidence for a reasonable jury to find for the Commission. There's insufficient evidence that any of the panelists commented on or considered Mr. Bouamama's religion or national origin during the selection process for the Sales Supervisor position.

With regard to a separation, there's insufficient evidence that any of the panelists commented on or considered Mr. Bouamama's national origin when they offered him a choice between Sales Representative — going back to the Sales Representative position or offering him a severance agreement.

There's also insufficient evidence that the panel considered his religion, Muslim.

With regard to the comparators [sic], there's insufficient evidence that Go Daddy treated Mr. Bouamama differently than the employees outside his protected class. There's been no evidence at trial regarding the national origin or religion of the successful candidates, the unsuccessful candidates, or the decision-makers in this case.

*With regard to the Commission's retaliation claim, there hasn't been any evidence that Miss Slezak told any other panel members regarding the alleged reports made to her by Mr. Bouamama. Mr. Franklin and Mr. Villeneuve both testified that, in fact, Miss Slezak had not reported any protected activity to them, and without this knowledge, knowledge by one of the three panel members is insufficient for the jury to return a verdict on retaliation.*

(emphasis added). The only part of the Rule 50(a) motion relating to the EEOC's retaliation claim was the italicized paragraph. The trial court took Go Daddy's motion "under advisement" and submitted the case to the jury.

The jury returned a verdict in favor of the EEOC on the retaliation claim. The jury otherwise returned a verdict in favor of Go Daddy. The jury awarded Bouamama $5,000 for mental and emotional pain and suffering and $135,000 for lost earnings. The jury also awarded $250,000 in punitive damages.

Following the verdict, Go Daddy filed a renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). In its renewed motion, Go Daddy argued, "Plaintiff failed to present sufficient evidence for a reasonable trier of fact (1) to determine that Bouamama engaged in protected activity under Title VII to support a retaliation claim, or (2) to determine that a causal connection existed between Bouamama's alleged complaint to Heather Slezak ("Slezak") and his alleged termination." In the alternative, Go Daddy moved for a new trial under Rule 59(a). Go Daddy also moved to reduce the total jury award to $200,000 under 42 U.S.C. § 1981a. The EEOC moved for equitable relief, including "back pay with prejudgment interest" and "reinstatement and/or front pay."

The district court denied Go Daddy's Rule 50(b) and Rule 59(a) motions. The court granted Go Daddy's motion to reduce the jury's total damage award to $200,000. The court granted the EEOC's motion in part, awarding Bouamama $36,552 in back pay and $5,156 in prejudgment interest, but declining to order that he be reinstated.

Go Daddy appeals the district court's denial of its Rule 50(b) motion for judgment as a matter of law and its Rule 59(a) motion for a new trial. For the reasons that follow, we affirm the district court.

## II.   Standard of Review

"We review de novo the district court's denial of a renewed motion for judgment as a matter of law" under Rule 50(b).

*Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006). "[I]n entertaining a motion for judgment as a matter of law, the court . . . may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Rather, "[w]e must view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." *Josephs*, 443 F.3d at 1062. "The test applied is whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Id.*

A Rule 50(b) motion for judgment as a matter of law is not a freestanding motion. Rather, it is a renewed Rule 50(a) motion. Under Rule 50, a party must make a Rule 50(a) motion for judgment as a matter of law before a case is submitted to the jury. If the judge denies or defers ruling on the motion, and if the jury then returns a verdict against the moving party, the party may renew its motion under Rule 50(b). Because it is a renewed motion, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion. Thus, a party cannot properly "raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion." *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003) (citing Fed. R. Civ. P. 50 advisory committee's notes to the 1991 amendments ("A post trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion.")); *Murphy v. City of Long Beach*, 914 F.2d 183, 186 (9th Cir.1990) ("[Judgment notwithstanding the verdict] is improper if based upon grounds not alleged in a directed verdict [motion]." (brackets in original)); *see also* Fed. R. Civ. P. 50 advisory committee's notes to the 2006 amendments ("Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion."). However, Rule 50(b) "may be satisfied by an ambiguous or inartfully made motion" under Rule 50(a). *Reeves v. Teuscher*, 881 F.2d 1495, 1498 (9th Cir. 1989). Absent such a lib-

eral interpretation, "the rule is a harsh one." *Nat'l Indus., Inc. v. Sharon Steel Corp.*, 781 F.2d 1545, 1549 (11th Cir. 1986).

We review a jury's verdict for substantial evidence in ruling on a properly made motion under Rule 50(b). *Janes v. Wal-Mart Stores, Inc.*, 279 F.3d 883, 888 (9th Cir. 2002). However, in ruling on a Rule 50(b) motion based on grounds not previously asserted in a Rule 50(a) motion, "we are limited to reviewing the jury's verdict for plain error, and should reverse only if such plain error would result in a manifest miscarriage of justice." *Id.* (internal quotation marks and citation omitted); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1109 (9th Cir. 2001). "This exception . . . permits only extraordinarily deferential review that is limited to whether there was *any* evidence to support the jury's verdict." *Id.*

We review the district court's ruling on a motion for a new trial under Rule 59(a) for an abuse of discretion. *McEuin v. Crown Equip. Corp.*, 328 F.3d 1028, 1032 (9th Cir. 2003). The district court's denial of a motion for a new trial is reversible "only if the record contains no evidence in support of the verdict" or if the district court "made a mistake of law." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (internal quotation marks and citations omitted).

## III.   Discussion

We divide our discussion into two parts. First, we address Go Daddy's appeal of the district court's denial of its motion under Rule 50(b) for judgment as a matter of law. Second, we address Go Daddy's appeal of the district court's denial of its motion under Rule 59(a) for a new trial.

### A.   Rule 50(b) Motion for Judgment as a Matter of Law

The entirety of Go Daddy's Rule 50(a) argument in the district court on the EEOC's retaliation claim was as follows:

> With regard to the Commission's retaliation claim, there hasn't been any evidence that Miss Slezak told any other panel members regarding the alleged reports made to her by Mr. Bouamama. Mr. Franklin and Mr. Villeneuve both testified that, in fact, Miss Slezak had not reported any protected activity to them, and without this knowledge, knowledge by one of the three panel members is insufficient for the jury to return a verdict on retaliation.

Go Daddy made two arguments in the district court in support of its Rule 50(b) motion on the EEOC's retaliation claim. It repeats those same two arguments to us on appeal.

Go Daddy's first argument in its Rule 50(b) motion is that there was insufficient evidence at trial to show Bouamama engaged in protected activity. Depending on the circumstances, reports of improper workplace behavior can be protected activity under Title VII. Go Daddy contends that it argued in its Rule 50(a) motion that there was insufficient evidence of protected activity by referring to Bouamama's "reports" to Slezak as "alleged." The use of the word "alleged" can be read as an attempt to maintain Go Daddy's position, presented through Slezak's testimony, that Bouamama never registered any complaints about his treatment at Go Daddy. The word "alleged," however, does not advance the argument that any reports Bouamama actually made were not protected activity.

Go Daddy's second argument in its Rule 50(b) motion is that even if there were sufficient evidence that Bouamama engaged in protected activity, there was insufficient evidence that Go Daddy terminated him because of this activity. There are two parts to this argument. First, Go Daddy argues that there was insufficient evidence that Slezak told Franklin and Villeneuve about Bouamama's reports to her. The logical extension of this argument is that if Slezak did not tell them of Bouamama's reports to her, those reports could not have

motivated Franklin to terminate Bouamama. Read fairly, Go Daddy made this argument, and its logical extension, in its Rule 50(a) motion. Second, Go Daddy argues that Franklin had decided to terminate Bouamama on April 4, three days before Bouamama spoke to Slezak. Therefore, Go Daddy argues, Bouamama's protected activity could not have motivated his termination. To the extent that this argument relies on anything other than Go Daddy's argument that there was insufficient evidence that Slezak told Franklin and Villeneuve about Bouamama's reports, it was not made in Go Daddy's Rule 50(a) motion.

We evaluate Go Daddy's argument that any reports Bouamama made were not protected activity under the deferential plain error standard applicable to arguments not made in a Rule 50(a) motion. We also evaluate Go Daddy's argument that there was insufficient evidence that Franklin made the decision to terminate Bouamama after Bouamama engaged in protected activity under the plain error standard. Under that standard, if there is "any evidence" to support the jury's verdict, it must be upheld. *Yeti by Molly*, 259 F.3d at 1109.

We evaluate Go Daddy's arguments that there was insufficient evidence both that Bouamama complained to Slezak and that Slezak told Franklin and Villeneuve about Bouamama's reports under the substantial evidence standard applicable to arguments made in a Rule 50(a) motion. Under that standard, the jury's verdict must be upheld if there is "evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

### 1.    Protected Activity

**[1]** Under Title VII of the Civil Rights Act, an employer cannot "discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of

such individual's . . . religion . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). An employer cannot retaliate against an employee for "oppos[ing] any practice made an unlawful employment practice by this subchapter." *Id.* § 2000e-3(a). Under the latter provision, a complaint by an employee that a supervisor has violated Title VII may constitute protected activity for which the employer cannot lawfully retaliate. *See Trent v. Valley Elec. Ass'n, Inc.*, 41 F.3d 524, 526 (9th Cir. 1994).

In its brief to us, Go Daddy makes two specific arguments in support of its argument that there is insufficient evidence that Bouamama engaged in protected activity.

**[2]** First, Go Daddy argues that the jury should not have believed that Bouamama complained to Slezak about what he claimed to perceive as discrimination. In his testimony, quoted above, Bouamama stated that he complained to Slezak either two or three times about what he perceived as discriminatory comments. Slezak testified that he never complained to her. Under the substantial evidence standard, we hold that Bouamama's testimony is adequate to support the jury's conclusion that Bouamama was more credible on this point, even though it might have been "possible to draw a contrary conclusion." *Pavao*, 307 F.3d at 918.

**[3]** Second, Go Daddy argues that even if Bouamama did complain to Slezak, this was not protected activity under the Supreme Court's decision in *Clark County School District v. Breeden*, 532 U.S. 268 (2001). In *Breeden*, the Court held that "offhand comments, and isolated incidents (unless extremely serious)" do not amount to discrimination. *Id*. at 271 (internal quotation marks omitted). If a person has been subjected to only an isolated incident, a complaint about that incident does not constitute protected activity unless a reasonable person would believe that the isolated incident violated Title VII. This reasonable person determination requires "[l]ooking at all the circumstances, including the frequency of the discrimi-

natory conduct[ ] [and] its severity," *Breeden*, 532 U.S. at 270-71 (internal quotation marks omitted).

Go Daddy insists in its brief that Bouamama's complaint to Slezak on April 7 about his exchange with Franklin earlier in the day was, at most, a complaint about an "offhand comment" or an "isolated incident." It writes, "Even assuming the jury completely bought Bouamama's testimony about his alleged *single complaint* to Slezak on April 7, 2003[,] about an incident that occurred earlier that same day, that conduct fails to reach the bar set [by] the United States Supreme Court in [*Breeden*]." (emphasis in original).

Go Daddy's argument ignores Bouamama's actual testimony. As recounted above, Bouamama testified that he complained to Slezak two or three times about comments that had been made about his national origin and religion. His complaint on April 7 about Franklin's comments was only the latest of these. In his testimony, he specifically recounted that he had previously complained to Slezak about a conversation in which Villeneuve, his supervisor, asked about the languages he spoke (French and Arabic) and about his religion (Muslim).

**[4]** Bouamama also testified that Villeneuve later made a comment near his cubicle, "The Muslims need to die. The bastard Muslims need to die." However, he testified that he did not complain on that occasion because "[t]here's a culture in Go Daddy. You complain you get fired." The fact that Bouamama did not report these comments does not make them irrelevant to the inquiry concerning the reasonableness of his belief that a violation of Title VII had occurred.

"Looking at all the circumstances" requires us to take note not only of all comments of which Bouamama complained but also of the context in which they were made. Franklin's comments on April 7 were not "isolated" from the terms and conditions of Bouamama's employment. At the time of those

comments, Bouamama had just received word that his position had been eliminated and that his only option to avoid demotion involved an application process to be headed by Franklin. There is, thus, a strong nexus between Franklin's comments and the terms of Bouamama's continued employment, as noted by Bouamama himself in his final report to Slezak.

**[5]** Further, if a person has been subjected to more than one comment, and if those comments, taken together, would be considered by a reasonable person to violate Title VII, that person need not complain specifically about all of the comments to which he or she has been subjected. Unreported comments, in other words, are relevant to the inquiry concerning the reasonableness of the belief that a violation has occurred. In such circumstances, a complaint about one or more of these comments is protected behavior. We do not read *Breeden* to require more.

**[6]** There is, therefore, evidence to support a reasonable person's conclusion that the conduct to which Bouamama had been subjected at Go Daddy went beyond mere "offhand comments" and "isolated incidents," *id.* at 271, and that Bouamama's two, and possibly three, complaints to Slezak were therefore protected activity. We hold that this testimony satisfies the "any evidence" standard applicable to a faulty Rule 50(b) motion. *Yeti by Molly*, 259 F.3d at 1109.

## 2.    Causation

We evaluate separately each of Go Daddy's two specific arguments in support of its argument that there was insufficient evidence to support a conclusion that Bouamama's complaints to Slezak motivated Go Daddy's decision to terminate him.

### a. Evidence that Slezak Told Franklin about Bouamama's Complaints

Bouamama testified that he complained about Franklin to Slezak on April 7, 2003. Slezak testified that on April 9 and 10, 2003, she and Franklin, along with Villeneuve, interviewed 14 candidates for the Sales Supervisor positions. After the interviews were complete, she testified that "the three of us, [Franklin], [Villeneuve], and myself . . . started to talk about the candidates." She further testified that on April 11 and 14, 2003, she, Franklin, and Villeneuve met with all 14 of the candidates individually to tell them whether they were selected. Franklin corroborated this testimony. Bouamama testified that on April 14, 2003, when he passed Franklin's office and Franklin said "come here, the F word," Slezak was in Franklin's office.

The district court found, "Mr. Bouamama testified that he was terminated by Mr. Franklin and Ms. Slezak. He also testified that he complained to Ms. Slezak about discriminatory conduct by Mr. Franklin only days before his termination . . . . [T]he Court concludes that the jury reasonably could have found that both Mr. Franklin and Ms. Slezak were aware of the protected activity and that their termination of Mr. Bouamama was in response to that activity."

**[7]** We agree with the district court. A reasonable jury hearing the testimony just recounted could have concluded that Slezak had ample opportunities to inform Franklin of Bouamama's complaint and had, in fact, done so. We therefore hold, under the substantial evidence standard, applicable to a properly made Rule 50(b) motion, that there was sufficient evidence to support the jury's conclusion.

### b. Evidence that Go Daddy Decided on April 4 to Terminate Bouamama

Nothing in the record supports a conclusion that Go Daddy decided on April 4 to terminate Bouamama. Bouamama testi-

fied specifically to the contrary, as did Villeneuve, Franklin, and Slezak.

Bouamama testified that he was told during his meeting with Slezak, Franklin, and Villeneuve on April 4 that his position was being eliminated and that he could apply for one of the new Sales Supervisor positions, or that he could "walk away." Later, in response to a separate question about the April 4 meeting, Bouamama testified, "They told me that, you know, you can apply for this position and — you know, or you can walk away." As Bouamama understood the phrase, being told that he could "walk away" did not mean that he was fired. Rather, as recounted above, Bouamama specifically testified that "walk away" meant that he could "quit on his own."

Bouamama also testified that he had been given the option to apply for one of the new Sales Supervisor positions "or walk away *or go back to the floor*" (emphasis added). This statement is consistent with what Bouamama wrote on the EEOC questionnaire that he filled out on the morning of April 17, before he was terminated. He wrote that he was "in process of being demoted or choice to walk away." It is also consistent with his statement on the EEOC Charge of Discrimination form: "I was told that if I was not selected for a supervisory position I could 'go back to the beginning' (meaning I could demote to my original sales position), or I had a choice to 'walk away.' "

Villeneuve testified that unsuccessful applicants for the Sales Supervisor positions "could go back to the phones." Franklin testified that "we encouraged" applicants who did not get the Sales Supervisor position "to go back to the phones." Slezak testified that on April 14, 2003, after telling Bouamama that he did not get the Sales Supervisor position, "We thanked him for his time, encouraged him to stay with the organization because there would be opportunity in the

future, and presented him the same options to retain a position . . . or take a severance package and leave the company."

Based on this testimony, the jury could reasonably conclude that at the time of his meeting with the panel on April 14, 2003, Bouamama had the option of returning to his original sales position at Go Daddy.

Bouamama's and Rechterman's testimony about the additional project assigned to Bouamama are also inconsistent with an April 4 decision to terminate. A jury could very reasonably conclude that the assignment of a new project on April 15 contradicts the assertion Go Daddy now makes. Indeed, the very fact that Bouamama was still at work at Go Daddy on April 15 (and apparently still employed on April 17 when he called in sick) belies a decision to terminate on April 4. By April 14, Go Daddy had eliminated Bouamama's position and determined that he would not receive one of the Sales Supervisor assignments. Yet he continued to show up at work and to complete assignments, even new ones.

**[8]** To understate the matter, there is evidence that Go Daddy's decision to terminate Bouamama was not made on April 4, but rather was made sometime between April 14, when he was told he could return to his original sales position, and April 17, when he was told that he was terminated. We hold that this evidence satisfies the "any evidence" standard applicable to a faulty Rule 50(b) motion. *Yeti by Molly*, 259 F.3d at 1109.

### B.   Motion for New Trial

**[9]** In support of its Rule 59(a) motion for a new trial, Go Daddy essentially repeats the same arguments that we have examined and rejected above. Because the record contains "evidence in support of the verdict," and because Go Daddy has failed to show that the district court "made a mistake of law," the district court did not abuse its discretion in denying

Go Daddy's motion for a new trial. *Molski*, 481 F.3d at 729 (internal quotation marks omitted).

## Conclusion

For the foregoing reasons, we affirm the district court's denial of Go Daddy's motion for judgment as a matter of law under Rule 50(a), and we affirm the district court's denial of Go Daddy's motion for a new trial under Rule 59(a).

---

NOONAN, Circuit Judge, dissenting:

*Summary*. Summing up the evidence supporting the jury verdict of retaliation by Go Daddy, the majority concludes:

> There is, therefore, evidence to support a reasonable person's conclusion that the conduct to which Bouamama had been subjected at Go Daddy went beyond mere "offhand comments" and "isolated incidents," *Breeden* at 271, and that Bouamama's two, and possibly three, complaints to Slezak were therefore protected activity. We hold that this testimony satisfies the "any evidence" standard.

Two conversations were reported to Slezak. No evidence was offered of a "possible" third. No rational person could have thought that the two conversations with two different men in different contexts and at widely separated times constituted a pattern of discriminatory conduct by Go Daddy. Even the jury did not think they did, returning an answer of "No" to the question asking if Go Daddy had discriminated. If a reasonable person could believe, albeit mistakenly, that he was reporting and opposing a pattern of discrimination, his opposition would be protected. But Bouamama did not report a pattern. At most he reported a single sentence that he deemed discriminatory. So, the evidence that the majority

finds supports the jury's findings of liability and imposition of punitive damages is what? If Bouamama did not report discrimination, what did Go Daddy retaliate against? The majority, combing for straws, has not provided any pattern of protected activity on which the retaliation claim could stand.

*The majority opinion.* The majority opinion sets out carefully and conscientiously the evidence it finds relevant. Faithful to stating the facts, the majority characterizes them in a way that they appear to affirmatively answer the three questions that the jury had to answer affirmatively in order to find in favor of Bouamama, so that the conclusion is:

(1) Bouamama engaged in protected activity, that is, opposing discrimination under Title VII.

(2) The company . . . terminated him.

(3) The protected activity was a substantial or motivating factor in the company's action. *See EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1012 (9th Cir. 1983).

The jury found that neither Bouamama's Moroccan origin nor his Moslem religion motivated Go-Daddy's decision not to promote him to Sales Supervisor. The jury also found that Go-Daddy terminated Bouamama "in retaliation for his engaging in a protected activity" and that Go-Daddy acted with malice or reckless indifference to his protected activity. The jury awarded $5,000 for mental and emotional distress, $135,000 for lost earnings, and $250,000 in punitive damages.

Was there any evidence that Go-Daddy retaliated for Bouamama's performance of protected acts opposing a discrimination employment practice?

Not every report of an event that an employee perceives as discriminatory activity is protected. In order to constitute protected activity, a complaint must be based on an employee's

"reasonable belief" that he is reporting conduct that violates Title VII. *See Learned v. City of Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988). What the employee opposes must be "a practice." *Trent v. Valley Elec. Ass'n*, 41 F.3d 524, 526 (9th Cir. 1994).

*Bouamama's alleged protected activity*. Let's look at what the majority characterizes as Bouamama's protected activity:

(1) In December 2001 or January 2002, Villeneuve, hearing Bouamama dealing with a caller in French, asked Bouamama what languages he spoke. He answered, "French and Arabic." In Villeneuve's view Bouamama's fluency was an asset. Bouamama produced no evidence of a contrary evaluation. Villeneuve added to his question about language by asking Bouamama's country of origin and religion. Villeneuve offered no comment on them.

Six months after the questions had been asked, Bouamama told Heather Slezak in Human Resources of the questions. In the meantime, Villeneuve had given Bouamama a promotion and a big increase in salary. It is difficult to understand why, six months after the conversation, Bouamama would complain about it. It is even more difficult to construe two questions following up Bouamama's knowledge of foreign languages as "discriminatory behavior." It is impossible to see Bouamama's conversation with Slezak as an employee opposing unlawful discrimination.

The majority, however, colors Bouamama's conversation with Slezak by what Bouamama did not say to her. At some undetermined time but after 9/11/01, Bouamama heard Villeneuve talking to other employees in a hallway near Bouamama's cubicle. Villeneuve said, "The Muslims need to die. The bastard Muslims need to die." Bouamama was not the addressee of this comment. He did not report it to anyone. His memory of it was disclosed at trial. It is difficult to understand the remark as other than random, not aimed at Bouamama,

and expressing what many Americans may have thought about "the bastard Muslims," i.e., the terrorists who had rained terror on New York on 9/11. As Bouamama himself testified, "I understand maybe the anger that some people are expressing." Bouamama did not complain about what he overheard. It is not even clear that he heard the remarks before he told Slezak about the December 2001 conversation. By no stretch were the remarks indicative of any employment practice. Therefore, the chance and unreported remarks generated no protected activity and are irrelevant to Bouamama's claim of retaliation.

(2) On April 1, 2003, Craig Franklin replaced Villeneuve as Bouamama's immediate supervisor. On April 7, Franklin entered Bouamama's cubicle and began to converse with him. In Bouamama's mind "trouble started" when Franklin asked where the pictures decorating the cubicle came from. Bouamama answered, "Morocco." Franklin asked him if he were from Morocco and if he were Moslem. Bouamama answered, "Yes." Franklin said, "You know you're lucky that I like you." That afternoon, Bouamama told Slezak of the conversation.

It is possible to interpret Franklin's ambiguous "You're lucky . . ." as an implicitly negative comment on Bouamama's origin and religion. However, even if this interpretation is made, Bouamama's report to Slezak could not be classified as an instance of protected activity. Franklin's comment is simply one remark made by a new man on the job. A "recurring point in [our] opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' " *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998) (citation omitted).

The majority cites Bouamama's testimony that he complained to Slezak "two or three times." Bouamama identifies his report on the conversation with Franklin as "the second

time" he complained. The record is bare of any other complaint.

Franklin's conversation cannot be read together with Villeneuve's earlier remarks to form a pattern that any reasonable person could interpret as discriminatory. No evidence exists of any relation whatsoever between Franklin's words and Villeneuve's. There is no pattern of an employment practice created by the two conversations. No reasonable person could use Villeneuve's earlier conversation, which, as already noted, was entirely unremarkable and led on to no negative effects for Bouamama, to interpret Franklin's remarks of over one year later to be more than an "isolated incident."

*The termination.* As the majority relates, upon taking over on April 1, 2003, Franklin immediately reorganized the call center where Bouamama worked, eliminating 13 positions including Bouamama's. There is no suggestion that the reorganization had any discriminatory motive. On April 4, Franklin, Villeneuve, and Slezak told Bouamama that his job was being eliminated. He was told he could apply for a new Sales Supervisor position or "walk away."

On April 7-9, 2003, Franklin, Villeneuve, and Slezak interviewed 13 candidates for the Sales Supervisor position and hired 6, not including Bouamama, who was rated "near the bottom." Bouamama learned that he had not been promoted on April 14. After unsuccessfully doing a marketing report on April 15 for another department of the company, he ended his employment on April 17.

Bouamama's own testimony demonstrates that he believed that Go Daddy terminated him on April 4 unless he won a promotion to the Sales Supervisor position. But the date of April 4 is not critical to this case. Accepting the majority's view that he was terminated April 17, there is no evidence in the record that Bouamama engaged in any protected activity or that any such activity was the cause of an employment

action. Bouamama never reported Villeneuve's undated comment about "bastard Muslims" and so it is irrelevant to Bouamama's claim of retaliation: Go Daddy cannot have retaliated for a report that was never made. As for what Bouamama did report, neither Villeneuve's questions nor Franklin's April 7 comment to Bouamama could have been taken by any reasonable person to be a practice affecting the terms and conditions of employment in violation of Title VII. Bouamama's reports of those incidents were not protected activity opposing discrimination by the employer.

*Conclusion*. The majority cites the controlling law, *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001). Unanimously reversing our court in a per curiam opinion, the Supreme Court corrected a memorandum disposition of this circuit in favor of Shirley Breeden, an employee who reported an employer's crude sexual comment. The circuit had held that the report was protected activity if Breeden had a good faith belief that the remark was unlawful sexual harassment. The Supreme Court pointed out that Title VII forbids actions that discriminate "with respect to [an individual's] compensation, terms, conditions, or privileges of employment," *Id*. at 270, citing 42 U.S.C. § 2000e-2(a)(1). Workplace behavior, the Supreme Court explained, must be measured "by 'looking at all the circumstances,' including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Id*. at 270-271, quoting *Farragher*, quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). If the employee here experienced more than Shirley Breeden did, it does not appear on this record.

In the present case, the EEOC has produced zero evidence of protected activity affecting Bouamama's conditions of employment. The six months late report of Villeneuve's questions was not protected activity. The overhearing of Villeneuve's reaction to 9/11 did not give rise to a reasonable

belief that Bouamama's patron and promoter was engaged in unlawful discrimination affecting his employment, nor did this belief lead Bouamama to oppose any employment practice.

The April 7 report of Franklin's single sentence was, at most, the report of an offhand, isolated comment. Was Franklin's ambiguous comment repeated? No. Was it physically threatening or humiliating? No. Did it interfere with Bouamama's work performance? No. Did it affect his compensation? No. Did it affect his promotion to Sales Supervisor? No. Can this second report to Slezak show a pattern or practice of discriminatory conduct? No. No evidence, under the standard set by the Supreme Court, supported the jury's verdict.

I accept the majority's view that we review the jury's verdict under the plain error standard. Jury verdicts deserve all the deference that the law wisely accords them. But appellate courts, too, have a function in reviewing what the jury did. If there is any evidence that Bouamama opposed an unlawful employment practice, the verdict should stand. There is none. The result of the trial was a miscarriage of justice. The affirmation of that result is made quoting the United States Supreme Court and flouting its holdings in *Harris*, *Farragher* and *Breeden*.

I dissent.