# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

F.B.T. PRODUCTIONS, LLC; EM2M, LLC,

*Plaintiffs-Appellants,*

v.

AFTERMATH RECORDS, DBA Aftermath Entertainment; INTERSCOPE RECORDS; UMG RECORDING, INC.; ARY, INC.,

*Defendants-Appellees.*

No. 09-55817

D.C. No.
2:07-cv-03314-PSG-MAN

F.B.T. PRODUCTIONS, LLC; EM2M, LLC,

*Plaintiffs-Appellants,*

v.

AFTERMATH RECORDS, DBA Aftermath Entertainment; INTERSCOPE RECORDS; UMG RECORDING, INC.; ARY, INC.,

*Defendants-Appellees.*

No. 09-56069

D.C. No.
2:07-cv-03314-PSG-MAN

OPINION

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, District Judge, Presiding

Argued and Submitted
July 12, 2010—Pasadena, California

Filed September 3, 2010

13399

Before: Jerome Farris, Cynthia Holcomb Hall and
Barry G. Silverman, Circuit Judges.

Opinion by Judge Silverman

## COUNSEL

Jerome B. Falk Jr., Daniel B. Asimow, and Sara J. Eisenberg, Howard Rice Nemerovski Canady Falk & Rabkin PC, San Francisco, California; and Richard S. Busch, King & Ballow, Nashville, Tennessee, for the plaintiffs-appellants.

Glenn D. Pomerantz, Kelly M. Klaus, and Melinda E. Lemoine, Munger, Tolles & Olson LLP, Los Angeles, California, for the defendants-appellees.

## OPINION

SILVERMAN, Circuit Judge:

This dispute concerns the percentage of royalties due to Plaintiffs F.B.T. Productions, LLC, and Em2M, LLC, under their contracts with Defendant Aftermath in connection with the recordings of Marshal B. Mathers, III, professionally known as the rap artist Eminem.[1] Specifically, F.B.T. and Aftermath disagree on whether the contracts' "Records Sold" provision or "Masters Licensed" provision sets the royalty rate for sales of Eminem's records in the form of permanent downloads and mastertones. Before trial, F.B.T. moved for summary judgment that the Masters Licensed provision unambiguously applied to permanent downloads and mastertones. The district court denied the motion. At the close of evidence, F.B.T. did not move for judgment as a matter of law, and the jury returned a verdict in favor of Aftermath. On appeal, F.B.T. reasserts that the Masters Licensed provision unambiguously applies to permanent downloads and mastertones. We agree that the contracts are unambiguous and that the district court should have granted summary judgment to F.B.T. We therefore reverse the judgment and vacate the district court's order awarding Aftermath its attorneys' fees.

### BACKGROUND

F.B.T. signed Eminem in 1995, gaining exclusive rights to his recordings. In 1998, F.B.T. signed an agreement transfer-

---

[1]This case involves multiple Plaintiffs and Defendants. For ease of reference, we refer to Plaintiffs collectively as F.B.T. and to Defendants collectively as Aftermath.

ring Eminem's exclusive recording services to Aftermath. The "Records Sold" provision of that agreement provides that F.B.T. is to receive between 12% and 20% of the adjusted retail price of all "full price records sold in the United States . . . through normal retail channels." The agreement further provides that "[n]otwithstanding the foregoing," F.B.T. is to receive 50% of Aftermath's net receipts "[o]n masters licensed by us . . . to others for their manufacture and sale of records or for any other uses." The parties refer to this provision as the "Masters Licensed" provision. The contract defines "master" as a "recording of sound, without or with visual images, which is used or useful in the recording, production or manufacture of records." The agreement does not contain a definition of the terms "licensed" or "normal retail channels."

In 2002, Aftermath's parent company, Defendant UMG Recordings, Inc., concluded an agreement with Apple Computer, Inc., that enabled UMG's sound recordings, including the Eminem masters, to be sold through Apple's iTunes store as permanent downloads. Permanent downloads are digital copies of recordings that, once downloaded over the Internet, remain on an end-user's computer or other device until deleted. The contract between UMG and Apple is but one example of the many agreements that Aftermath has concluded to sell sound recordings in digital formats since approximately 2001. Since 2003, Aftermath has also concluded contracts with major cellular telephone network carriers to sell sound recordings as mastertones, which are short clips of songs that can be purchased by users to signal incoming calls, popularly known as ringtones.

In 2003, F.B.T. and Aftermath entered into a new agreement that terminated the 1998 agreement. The 2003 agreement increased some royalty rates, but incorporated the wording of the Records Sold and Masters Licensed provisions from the 1998 agreement. In 2004, the parties amended the agreement to provide that "Sales of Albums by way of perma-

nent download shall be treated as [U.S. Normal Retail Channel] Net Sales for the purposes of escalations." Escalations are increases in the royalty rate when total album sales surpass certain targets. The amendment further provides, "Except as specifically modified herein, the Agreement shall be unaffected and remain in full force and effect."

F.B.T. brought suit after a 2006 audit showed that Aftermath had been applying the Records Sold provision to calculate the royalties due to F.B.T. for sales of Eminem's recordings in the form of permanent downloads and mastertones. Before trial, F.B.T. moved for summary judgment that the Masters Licensed provision unambiguously applied to those sales. Aftermath cross-moved for summary judgment. It argued, in part, that the 2004 amendment showed that the parties intended the Records Sold provision to apply to permanent downloads.

After provisionally reviewing the undisputed extrinsic evidence, the district court concluded that the agreements were reasonably susceptible to either party's interpretation and denied both motions for summary judgment. At trial, only Aftermath moved for judgment as a matter of law at the close of the evidence. The court denied the motion. The jury returned a verdict in favor of Aftermath, and the district court awarded Aftermath its attorneys' fees of over $2.4 million. F.B.T. timely appealed the district court's final judgment and award of attorneys' fees. We have jurisdiction pursuant to 28 U.S.C. § 1291 and we reverse.

## DISCUSSION

### I. *F.B.T. Is Not Precluded from Arguing that the Masters Licensed Provision Unambiguously Applies to Permanent Downloads and Mastertones.*

[1] F.B.T. did not file a pre-verdict motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure

50, so it has not preserved "a challenge to the sufficiency of the evidence to support the verdict" in this case. *Nitco Holding Corp. v. Boujikian*, 491 F.3d 1086, 1089 (9th Cir. 2007). However, F.B.T.'s argument that the contracts are unambiguous raises an issue of law that does not rest on the sufficiency of the evidence to support the jury's verdict. *See Wolf v. Superior Court*, 8 Cal. Rptr. 3d 649, 656 (Ct. App. 2004) ("The trial court's determination of whether an ambiguity exists is a question of law, subject to independent review on appeal."). F.B.T. therefore did not have to present that argument in a motion for judgment as a matter of law. Rather, F.B.T. had to raise the argument at some point before the judge submitted the case to the jury, which it did. *See Cochran v. City of L.A.*, 222 F.3d 1195, 1200 (9th Cir. 2000) (holding that an issue of law that "does not concern the sufficiency of the evidence presented to the jury" need not be raised in a motion for judgment as a matter of law to preserve the issue for appeal); *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1370 (9th Cir. 1987) ("As long as a party properly raises an issue of law before the case goes to the jury, it need not include the issue in a motion for a directed verdict in order to preserve the question on appeal.").

F.B.T. argued that the contract was unambiguous in its motion for summary judgment, and the district court denied the motion. A district court's denial of summary judgment is subject to review on appeal, despite full trial on the merits, "where the district court made an error of law that, if not made, would have required the district court to grant the motion." *Banuelos v. Constr. Laborers' Trust Funds for S. Cal.*, 382 F.3d 897, 902 (9th Cir. 2004) (citing *Pavon v. Swift Transp. Co., Inc.*, 192 F.3d 902, 906 (9th Cir. 1999)). For example, in *Wilson Arlington Co. v. Prudential Insurance Co.*, 912 F.2d 366, 370-71 (9th Cir. 1990), we reversed the denial of a summary judgment motion after a jury trial because the contract in question was unambiguous as a matter of law. *Accord King v. PA Consulting Group, Inc.*, 485 F.3d 577, 589 (10th Cir. 2007) (holding that despite the absence of

a motion for judgment as a matter of law, "King adequately preserved the purely legal question of whether the Agreement is ambiguous by raising the matter in his trial brief"); *Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 718-20 (7th Cir. 2003) (reviewing a district court's conclusion on summary judgment that a contract was ambiguous despite the absence of a motion for judgment as a matter of law at trial); *White Consol. Indus., Inc. v. McGill Mfg. Co.*, 165 F.3d 1185, 1189-90 (8th Cir. 1999) (same).

Just as in *Wilson*, we may review the district court's determination that the contracts in this case are ambiguous. Under California law, "[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Cal. Civ. Code § 1638. Parol evidence is properly admitted to construe a contract only when its language is ambiguous.

> The decision whether to admit parol evidence involves a two-step process. First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine "ambiguity," i.e., whether the language is "reasonably susceptible" to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is "reasonably susceptible" to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract.

*Winet v. Price*, 6 Cal. Rptr. 2d 554, 557 (Ct. App. 1992). Despite the trial court's provisional review of extrinsic evidence, its determination of whether an ambiguity exists remains "a question of law, subject to independent review on appeal." *Wolf*, 8 Cal. Rptr. at 656; *see also City of Hope Nat'l Med. Ctr. v. Genetech, Inc.*, 181 P.3d 142, 156 (Cal. 2008) (stating that contract interpretation is a question of law for the

court "when it is based on the words of the instrument alone [or] when there is no conflict in the extrinsic evidence").

**[2]** Here, F.B.T. moved for summary judgment that the Masters Licensed provision unambiguously applied to permanent downloads and mastertones. The district court denied F.B.T.'s motion because it determined that the agreements were reasonably susceptible to Aftermath's contrary interpretation that the Records Sold provision applied. That determination was on a "question of law," *Wolf*, 8 Cal. Rptr. 3d at 656, that if decided in F.B.T.'s favor "would have required the district court to grant the [summary judgment] motion," *Banuelos*, 382 F.3d at 902. We may therefore review the district court's denial of summary judgment despite full trial on the merits.

## II.   *The District Court Erred in Determining that the Contracts Were Ambiguous.*

**[3]** Turning to the agreements in question, the Records Sold provision contains the royalty rate for "full price records sold in the United States . . . through normal retail channels." On summary judgment, Aftermath argued that the Records Sold provision applied because permanent downloads and mastertones are records, and because iTunes and other digital music providers are normal retail channels in the United States.

**[4]** However, the agreements also provide that "notwithstanding" the Records Sold provision, F.B.T. is to receive a 50% royalty on "masters licensed by [Aftermath] . . . to others for their manufacture and sale of records or for any other uses." The parties' use of the word "notwithstanding" plainly indicates that even if a transaction arguably falls within the scope of the Records Sold provision, F.B.T. is to receive a 50% royalty if Aftermath licenses an Eminem master to a third party for "any" use. A contractual term is not ambiguous just because it is broad. Here, the Masters Licensed provision

explicitly applies to (1) masters (2) that are licensed to third parties for the manufacture of records "or for any other uses," (3) "notwithstanding" the Record Sold provision. This provision is admittedly broad, but it is not unclear or ambiguous.

**[5]** Accordingly, to determine whether the Masters Licensed provision applies, we must decide whether Aftermath licensed the Eminem masters to third parties. Aftermath argues that there was no evidence that it or F.B.T. used the term "licensed" in a technical sense. *See* Cal. Civ. Code § 1644 ("The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense . . . ."). In the ordinary sense of the word, a license is simply "permission to act." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 1304 (2002). Aftermath did not dispute that it entered into agreements that permitted iTunes, cellular phone carriers, and other third parties to use its sound recordings to produce and sell permanent downloads and mastertones. Those agreements therefore qualify as licenses under Aftermath's own proposed construction of the term.

**[6]** The conclusion that Aftermath licensed the Eminem masters to third parties also comports well with and finds additional support in federal copyright law. When one looks to the Copyright Act, the terms "license" and "sale" have well differentiated meanings, and the differences between the two play an important role in the overall structures and policies that govern artistic rights. For example, under the language of the Act and the Supreme Court's interpretations, a "sale" of a work may either be a transfer in title of an individual copy of a work, or a sale of all exclusive intellectual property rights in a work. *See* 17 U.S.C. § 109 (describing the "first sale" doctrine); *Quality King Distribs. v. L'Anza Research Int'l*, 523 U.S. 135, 145 (1998) (describing the transfer of an individual copy of a work as a sale); *see also* 3-10 NIMMER ON

Copyright § 10.02 (2009) (describing a transfer of all owner-ship in a copyright as a sale).

**[7]** There is no dispute that Aftermath was at all relevant times the owner of the copyrights to the Eminem recordings at issue in this case, having obtained those rights through the recording contracts in exchange for specified royalty payments. Pursuant to its agreements with Apple and other third parties, however, Aftermath did not "sell" anything to the download distributors. The download distributors did not obtain title to the digital files. The ownership of those files remained with Aftermath, Aftermath reserved the right to regain possession of the files at any time, and Aftermath obtained recurring benefits in the form of payments based on the volume of downloads.

Much as Section 109 describes a "sale" under the "first sale" doctrine, various other sections of the Copyright Act illuminate the meaning of the term "license." For example, section 114(f), titled "Licenses for Certain Nonexempt Transmissions," describes the statutory authorization for a third party to exercise public performance rights that otherwise remain the exclusive rights of a copyright holder and defines this authorization as a "license." 17 U.S.C. § 114(f); *see also* 17 U.S.C. §§ 111(a), 114(d)(2). Section 115, titled "Scope of Exclusive Rights in Nondramatic Musical Works: Compulsory License for Making and Distributing Phonorecords," refers directly to the statutory authorization for artists to exercise the copyright owner's right to make and distribute phonorecord "covers" as a license, but again makes it clear that title remains with the copyright owner. 17 U.S.C. § 115.

**[8]** Under our case law interpreting and applying the Copyright Act, too, it is well settled that where a copyright owner transfers a copy of copyrighted material, retains title, limits the uses to which the material may be put, and is compensated periodically based on the transferee's exploitation of the material, the transaction is a license. *See, e.g.*, *Wall Data Inc.*

*v. Los Angeles County Sheriff's Dep't*, 447 F.3d 769, 785 (9th Cir. 2006); *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993); *United States v. Wise*, 550 F.2d 1180, 1190-91 (9th Cir. 1977); *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 103 (9th Cir. 1960).

It is easily gleaned from these sources of federal copyright law that a license is an authorization by the copyright owner to enable another party to engage in behavior that would otherwise be the exclusive right of the copyright owner, but without transferring title in those rights. This permission can be granted for the copyright itself, for the physical media containing the copyrighted work, or for both the copyright and the physical media.

**[9]** When the facts of this case are viewed through the lens of federal copyright law, it is all the more clear that Aftermath's agreements with the third-party download vendors are "licenses" to use the Eminem master recordings for specific purposes authorized thereby—i.e., to create and distribute permanent downloads and mastertones—in exchange for periodic payments based on the volume of downloads, without any transfer in title of Aftermath's copyrights to the recordings. Thus, federal copyright law supports and reinforces our conclusion that Aftermath's agreements permitting third parties to use its sound recordings to produce and sell permanent downloads and mastertones are licenses.

**[10]** Furthermore, the sound recordings that Aftermath provided to third parties qualify as masters. The contracts define a "master" as a "recording of sound . . . which is used or useful in the recording, production or manufacture of records." Aftermath admitted that permanent downloads and mastertones are records. The sound recordings that Aftermath supplied to third parties were "used or useful" in the production of permanent downloads and mastertones, so those sound recordings were masters. Because Aftermath permitted third parties to use the Eminem masters to produce and sell records,

in the form of permanent downloads and mastertones, F.B.T. is entitled to a 50% royalty under the plain terms of the agreements.

Aftermath argues that the 2004 amendment to the agreements clarified that the Records Sold provision sets the royalty for permanent downloads. However, the 2004 amendment states only that albums sold as permanent downloads are to be counted "for purposes of escalations" under the Records Sold provision, and that "[e]xcept as specifically modified herein, the Agreement shall be unaffected and remain in full force and effect." Read in context, the plain language of the amendment provides that sales of permanent downloads by third parties count towards escalations on the royalty owed when Aftermath itself sells records through normal retail channels. It does not state, and in no way implies, that the royalty rate for the sale of the permanent downloads by third parties is set by the Records Sold provision.

Nor did any of the evidence regarding industry custom or the parties' course of performance support Aftermath's interpretation that the Records Sold provision applies. Aftermath's expert explained that the Masters Licensed provision had in the past been applied "only to compilation records and incorporation into movies, TV shows, and commercials." It was, however, undisputed that permanent downloads and mastertones only came into existence from 2001 to 2003. Consequently, the fact that the Masters Licensed provision had never previously been applied to those forms of licensing is immaterial. There is no indication that the parties intended to confine the contract to the state of the industry in 1998. To the contrary, the contract contemplated advances in technology. It provided that Aftermath had the right to exploit the "masters in any and all forms of media now known and hereinafter developed." Aftermath's evidence of how the Masters Licensed provision had been applied in the past therefore did not cast doubt on its application to permanent downloads and mastertones.

**[11]** Furthermore, Aftermath renewed its agreement with F.B.T. in 2003, by which time permanent downloads and mastertones were coming into existence. Aftermath argued that subsequent to renewal, F.B.T. had "never objected to Defendants' payment of royalties under the Records Sold provision until the auditor raised the issue in 2006." However, Aftermath provided no evidence that F.B.T. knowingly acquiesced to payment under the Records Sold provision between 2003 and 2006. It showed that F.B.T. had received statements that included royalties for permanent downloads and mastertones, but it was uncontroverted that F.B.T. did not audit those royalty statements until 2006. F.B.T. had no obligation to audit the statements any earlier than it did, and it immediately raised the issue with Aftermath after the audit. Accordingly, Aftermath cannot use F.B.T.'s lack of objection to payments made before 2006 to prove how it interpreted the agreements. *See Barnhart Aircraft, Inc. v. Preston*, 297 P. 20, 22 (Cal. 1931) (holding that a party's acts can be used to construe its interpretation of an agreement only where such acts were "direct, positive and deliberate and . . . done in an attempted compliance with the terms of the contract or agreement"). The undisputed extrinsic evidence provisionally reviewed by the district court therefore did not support Aftermath's interpretation that the Records Sold provision applies.

**[12]** In sum, the agreements unambiguously provide that "notwithstanding" the Records Sold provision, Aftermath owed F.B.T. a 50% royalty under the Masters Licensed provision for licensing the Eminem masters to third parties for any use. It was undisputed that Aftermath permitted third parties to use the Eminem masters to produce and sell permanent downloads and mastertones. Neither the 2004 amendment nor any of the parole evidence provisionally reviewed by the district court supported Aftermath's interpretation that the Records Sold provision applied. Because the agreements were unambiguous and were not reasonably susceptible to Aftermath's interpretation, the district court erred in denying F.B.T. summary judgment.

The judgment in favor of Aftermath is REVERSED, the district court's order granting Aftermath its attorneys' fees is VACATED, and the case is REMANDED for further proceedings consistent with this opinion.