**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FIRST NATIONAL MORTGAGE
COMPANY, a California corporation,
      *Plaintiff-Appellee,*

    v.

FEDERAL REALTY INVESTMENT
TRUST,

      *Defendant-Appellant.*

No. 09-16377

D.C. No.
5:03-cv-02013-
RMW

FIRST NATIONAL MORTGAGE
COMPANY, a California corporation,
      *Plaintiff-Appellant,*

    v.

FEDERAL REALTY INVESTMENT
TRUST,

      *Defendant-Appellee.*

No. 09-16453

D.C. No.
5:03-cv-02013-
RMW

FIRST NATIONAL MORTGAGE
COMPANY, a California corporation,
      *Plaintiff-Appellee,*

    v.

FEDERAL REALTY INVESTMENT
TRUST,

      *Defendant-Appellant.*

No. 09-17012

D.C. No.
5:03-cv-02013-
RMW

2011

FIRST NATIONAL MORTGAGE
COMPANY, a California corporation,
*Plaintiff-Appellant,*

v.

FEDERAL REALTY INVESTMENT
TRUST,

*Defendant-Appellee.*

No. 09-17277

D.C. No.
5:03-cv-02013-
RMW

OPINION

Appeal from the United States District Court
for the Northern District of California
Ronald M. Whyte, Senior District Judge, Presiding

Argued and Submitted
December 7, 2010—San Francisco, California

Filed February 1, 2011

Before: Dorothy W. Nelson, David R. Thompson, and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge Thompson

## COUNSEL

Patrick Ryan, San Francisco, California, for plaintiff-appellee/appellant, First National Mortgage Co.

Cannon Shanmugam, Washington, DC, for defendant-appellant/appellee Federal Realty Investment Trust.

## OPINION

THOMPSON, Senior Circuit Judge:

Federal Realty Investment Trust ("Federal Realty") appeals the district court's judgment, pursuant to a jury's special verdict and the court's findings of fact and conclusions of law, in favor of First National Mortgage Company ("First National") in First National's action for breach of contract. First National sought to recover for Federal Realty's anticipatory breach of a "Final Proposal" signed by the parties with respect to commercial property in San Jose, California. The court awarded First National $15.9 million in damages for lost rent and for the loss of its "put" option under the Final Proposal. First National cross-appeals and also appeals the district

court's order denying it recovery of reasonable expert witness fees pursuant to California Code of Civil Procedure § 998(d).

We conclude that the district court did not err in finding that there was conflicting evidence as to whether the Final Proposal was meant to be binding and whether the parties intended the ten-year "put" and "call" options in it to provide for a ten-year duration of the lease. The district court, therefore, properly submitted these questions to the jury. Substantial evidence supports the jury's special verdict in favor of First National on both issues.

The district court also did not err in awarding First National the full benefit of its bargain in the form of damages for both lost rent and the value of its lost put option. Finally, the district court properly determined that First National could not recover the amount of its expert witness fees under the relevant California statute, but could recover limited expert witness fees pursuant to federal law. Accordingly, we affirm in all respects.

## I.  BACKGROUND

### A.  Factual history

Federal Realty is a publicly-traded real estate investment trust that owns and develops shopping centers and mixed-use projects. First National is a San Jose-based mortgage company. Beginning in the late 1990s, Federal Realty set out to develop Santana Row, a mixed-use project in San Jose, which was intended to be one of the nation's largest mixed-use projects. As part of its efforts to develop Santana Row, Federal Realty sought to acquire the property at issue in this case ("the Property"). The Property was owned by D&R Partnership (not a party to this suit) and leased by it to First National. During the relevant time, Hal Dryan had majority ownership and "absolute control" of both First National and D&R Partnership.

Over the course of several years, First National and Federal Realty engaged in protracted negotiations concerning the Property. At various points in the negotiations, Federal Realty offered either to buy the Property outright or to enter into a ground lease for it—i.e., a lease of the underlying land with the intention of redeveloping the buildings on the property. The negotiations intensified in the summer of 2000, when the parties exchanged several proposals regarding the terms for the ground lease, including a "Counter Proposal" and a "Revised Proposal." At this time, First National rejected Federal Realty's attempt to buy the Property outright, noting that "a purchase agreement does not address [First National's] long term interests." Finally, on August 25, 2000, Hal Dryan, on behalf of First National, and Steve Guttman, the President and CEO of Federal Realty, signed a document entitled "Final Proposal."

The Final Proposal is a one-page, nine-paragraph document regarding a ground lease of the Property. It provides for a rent of $100,000 per month, with increases of 3% annually. It gives First National a ten-year "put" option, allowing First National to require Federal Realty to buy the Property at any time during the ten years. It also gives Federal Realty a "call" option at the end of ten years, by which Federal Realty can require First National to sell it the Property at that time. The Final Proposal also provides that First National will be reimbursed $75,000 to buy out its current lease tenant, New Things West. Under the Final Proposal, Federal Realty was to "prepare a legal agreement for First National's review to finalize the agreement." The effective date of the agreement was to be the "date of vacating premises." Finally, the last clause of the Final Proposal provides: "The above terms are hereby accepted by the parties subject only to approval of the terms and conditions of a formal agreement." A copy of the Final Proposal is attached to this opinion as Appendix A.

Following the signing of the Final Proposal, the parties engaged in extensive, but ultimately unsuccessful, negotia-

tions towards a formal agreement. As part of these negotiations, the parties exchanged several ideas regarding the proposed lease, with Federal Realty suggesting a lease term of 34 years, and First National suggesting a lease term of 50 years. The parties also discussed the possibility of an outright sale, but First National refused to sell the Property for less than $15 million.

While these negotiations were ongoing, First National gave New Things West notice to vacate the premises. First National then informed Federal Realty of the notice to vacate and asked to be reimbursed for any accompanying loss in rent. In a letter dated May 11, 2001, Federal Realty rejected any indication that it had to reimburse First National and noted that "[b]ecause we have never resolved a number of significant business issues relating to the acquisition of the Property, we still do not have a binding agreement in place for that acquisition."

Soon thereafter, the real estate market took a turn for the worse, and, although the parties exchanged several more offers and counteroffers, they were unable to reach an agreement. When these efforts proved unsuccessful, First National filed this action. It recovered damages for Federal Realty's anticipatory breach of the Final Proposal, and this appeal followed.

## B. Procedural history

In its complaint, First National alleged that Federal Realty had committed a breach of contract (and anticipatory breach) by refusing to pay rent and repudiating First National's "put" to require Federal Realty to buy the Property. In response, Federal Realty filed several motions to dismiss and for summary judgment. As relevant to this appeal, the district court rejected Federal Realty's argument that the Final Proposal was not binding because of the last clause calling for a "formal agreement." According to the court, although the extrin-

sic evidence presented "persuasively suggest[ed] that the Final Proposal was conditional and that neither party intended otherwise," the last clause was reasonably susceptible to different interpretations, thereby precluding summary judgment.

The court also rejected Federal Realty's argument that the Final Proposal was not binding because it was missing an essential provision—the duration of the lease. In doing so, the court allowed First National to amend its complaint to allege that "the ten year 'put' and 'call' provisions . . . were intended by the parties, and each of them, to, and did, have a special meaning, that is, to establish a lease term of ten years." After examining the extrinsic evidence, the court concluded that First National's interpretation of the events surrounding the put and call options was "plausible" and sufficient for the question to go to the jury.

The liability phase of the case was tried to a jury in June 2006. The jury found in favor of First National on its anticipatory breach claim. The jury found that the parties intended the Final Proposal to be an enforceable agreement, and intended the put and call options to set a ground lease duration of ten years. The district court subsequently denied Federal Realty's motion for judgment as a matter of law or, in the alternative, a new trial, concluding there was sufficient evidence to support the jury's special findings.

The damages phase was tried to the court in April 2008. The court ultimately awarded First National damages of $15,901,274. Out of that amount, approximately $10.6 million, including interest, was based on lost rent from the ground lease, and approximately $5.2 million was based on Federal Realty's breach of First National's put option. The court specifically found that to receive the "full benefit of its bargain," First National was entitled to recover damages for both breach of the lease and breach of its put option.

The district court also denied First National's motion to recover certain expert witness fees under California Code of

Civil Procedure § 998(d), which was based on First National's pre-trial offer to compromise that Federal Realty rejected. The court found that First National reasonably incurred $358,811 in expert witness fees. However, First National could not recover those fees, but was limited to a recovery of expert witness fees under federal law, pursuant to this court's decision in *Aceves v. Allstate Ins. Co.*, 68 F.3d 1160, 1167-68 (9th Cir. 1995).

## II.   DISCUSSION

At the outset, we reject First National's argument that because there was a full trial on the merits, Federal Realty is precluded from challenging the district court's denial of its motions for summary judgment. *See F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958, 963 (9th Cir. 2010) ("A district court's denial of summary judgment is subject to review on appeal, despite full trial on the merits, 'where the district court made an error of law that, if not made, would have required the district court to grant the motion.' " (citation omitted)). Moreover, to preserve this issue for appeal, Federal Realty did not have to present it in a motion for judgment as a matter of law. *See id.* at 962-63 (holding that an issue of law that "does not rest on the sufficiency of the evidence to support the jury's verdict" need not be raised in a motion for judgment as a matter of law to preserve the issue for appeal). Rather, all Federal Realty had to do was "raise the argument at some point before the judge submitted the case to the jury," which it did. *See id.* at 963. Accordingly, the district court's determinations that portions of the Final Proposal were ambiguous are " 'question[s] of law, subject to independent review on appeal.' " *See id.* (citation omitted).

## A.   Questions of law

### 1.   Conditional nature of the Final Proposal

**[1]** Creation of a valid contract requires mutual assent. *Kruse v. Bank of Am.*, 202 Cal. App. 3d 38, 59 (1988).

"Where . . . there is a manifest intention that the formal agreement is not to be complete until reduced to a formal writing to be executed, there is no binding contract until this is done." *Smissaert v. Chiodo*, 163 Cal. App. 2d 827, 830-31 (1958). Thus, an "agreement to agree," without more, is not a binding contract. *Autry v. Republic Prods.*, 30 Cal. 2d 144, 151-52 (1947).

**[2]** However, an agreement is not unenforceable merely because it is subject to the approval of a formal contract. *See, e.g.*, *Gavina v. Smith*, 25 Cal. 2d 501, 504 (1944) (an exercise of an option created a binding lease, even though a formal instrument was to be prepared and signed later); *Pac. Improvement Co. v. Jones*, 164 Cal. 260, 264 (1912) (finding a binding contract for a lease, even though the testimony showed that "the parties contemplated substituting for this instrument a more formal lease"); *Cappelmann v. Young*, 73 Cal. App. 2d 49, 51-53 (1946) (finding an agreement to be a binding lease, even though it provided that "[a] proper lease shall be drawn within ten days"). Rather, "[w]hether a writing constitutes a final agreement or merely an agreement to make an agreement depends primarily upon the intention of the parties. In the absence of ambiguity this must be determined by a construction of the instrument taken as a whole." *Smissaert*, 163 Cal. App. 2d at 830.

**[3]** In this case, the court properly rejected Federal Realty's argument that the Final Proposal was not binding. The Final Proposal clearly states that its terms "are *hereby accepted* by the parties *subject only to* approval of the terms and conditions of a formal agreement" (emphases added).[1] In this regard, it is different from *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309 (9th Cir. 1996), on which Federal Realty

---

[1]Because both parties were involved in drafting the Final Proposal, we reject Federal Realty's suggestion that it should be construed against First National. *See Mitchell v. Exhibition Foods, Inc.*, 184 Cal. App. 3d 1033, 1042 (1986).

relies. In finding no binding contract in *Rennick*, we noted that the document in that case was titled "letter of intent" and specifically provided that "this letter of intent is of no binding effect." *Id.* at 315-16. In this case, the document is titled *"Final* Proposal," and it specifically *omits* Federal Realty's standard non-binding clause, which it had inserted in earlier drafts.

**[4]** Moreover, contrary to Federal Realty's argument, calling something a "proposal," instead of a "contract" or a "lease," does not necessarily mean it was not meant to be binding, especially where the circumstances suggest otherwise. *Cf. id.* at 315 ("[C]alling a document 'letter of intent' implies, unless circumstances suggest otherwise, that the parties intended it to be a nonbinding expression in contemplation of a future contract, as opposed to its [sic] being a binding contract."). Here, the circumstances demonstrate that the parties went from a *"Counter* Proposal," to a *"Revised* Proposal," to a *"Final* Proposal." In light of this, it cannot be said, as a matter of law, that the Final Proposal was not meant to be binding.

In reaching this conclusion, we do not question Federal Realty and the *amici curiae*'s assertion that non-binding preliminary agreements play an important role in real estate transactions. We do note, however, that at times it is equally important for the parties to be certain that their interim agreements in the midst of protracted negotiations can be enforced. As the California Supreme Court has noted,

> [w]here the parties . . . have agreed in writing upon the essential terms of the lease, there is a binding lease, even though a formal instrument is to be prepared and signed later. The formal instrument may be more convenient for purposes of recordation and better designed to prevent misunderstanding than the other writings but it is not essential to the existence of the lease. "The mere fact that a written lease was

in contemplation does not relieve either of the contracting parties from the responsibility of a contract which was already expressed in writing. When one party refuses to execute the lease according to the contract thus made, the other has a right to fall back on the written propositions as originally made, and the absence of the formal agreement contemplated is not material."

*Gavina*, 25 Cal. 2d at 504 (internal citations omitted). As such, the fact that the parties in this case were negotiating a new contract to replace the Final Proposal did not relieve either of them from their obligations under the Final Proposal, which was an existing contract.

### 2. *Omission of an essential element*

**[5]** To comply with the Statute of Frauds, there must be "some note or memorandum . . . subscribed by the party to be charged." Cal. Civ. Code § 1624(a). "A memorandum satisfies the statute of frauds if it identifies the subject of the parties' agreement, shows that they made a contract, and states the essential contract terms with reasonable certainty." *Sterling v. Taylor*, 40 Cal. 4th 757, 766 (2007). In this case, even assuming the Final Proposal falls within the Statute of Frauds as Federal Realty contends, we reject the argument that it is not binding because it omits an essential term in the form of the duration of the lease.

**[6]** The mere fact that a lease term is "essential" does not mean that it has to be *express* in the contract. On the contrary, although extrinsic evidence cannot be used to supply an essential term, it can be used "to *explain* essential terms that were understood by the parties but would otherwise be unintelligible to others." *Id.* at 767. Indeed, "California courts have not hesitated to imply a term of duration when the nature of the contract and surrounding circumstances afford a rea-

sonable ground for such implication." *Consol. Theatres, Inc. v. Theatrical Stage Emps. Union*, 69 Cal. 2d 713, 727 (1968).

**[7]** In this case, the district court did not err in allowing extrinsic evidence to be introduced to determine whether the lease duration was completely absent or whether it could be implied from the ten-year put and call options. California has long abandoned a rule that would limit the interpretation of a written instrument to its four corners. *See Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 37 (1968). Instead, under the California parol evidence rule, "[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Id.* Thus,

> [w]here the meaning of the words used in a contract is disputed, the trial court must provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning. Indeed, it is reversible error for a trial court to refuse to consider such extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and unambiguous on its face. Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible.

*Morey v. Vannucci*, 64 Cal. App. 4th 904, 912 (1998) (internal citations omitted).

The dispute in this case is whether the Final Proposal provides for the duration of the lease. Federal Realty contends that it does not. First National, on the other hand, argues that

a ten-year duration is implied through a combined reading of the ten-year put and call provisions. The question for the court, therefore, is whether the language of the Final Proposal is "reasonably susceptible" of either one of the two interpretations. *Pac. Gas & Elec. Co.*, 69 Cal. 2d at 37.

**[8]** We conclude that it is. By its terms, the Final Proposal allows First National to compel Federal Realty to buy the Property at any time within ten years and Federal Realty to compel First National to sell the Property to it at the end of ten years. As extrinsic evidence showed, the Property was crucial to Federal Realty's development of Santana Row. Moreover, the parties agreed to enter into a lease—instead of an outright sale—due to First National's reluctance to sell immediately. It was understood that as soon as Federal Realty was able to force a sale of the Property (i.e., at the end of ten years), it would do so. Accordingly, the court did not err in concluding that the Final Proposal was "reasonably susceptible" of either one of the two interpretations asserted by the parties, and therefore "extrinsic evidence relevant to prove either of such meanings [was] admissible." *See id.* at 40.

**[9]** The district court also did not err in letting the jury resolve the conflict. "Where the interpretation of contractual language turns on a question of the credibility of *conflicting* extrinsic evidence, interpretation of the language is not solely a judicial function. As trier of fact, it is the jury's responsibility to resolve any conflict in the extrinsic evidence properly admitted to interpret the language of a contract." *Morey*, 64 Cal. App. 4th at 912-13 (internal citations omitted).

## B.  Sufficiency of the evidence

We review de novo the denial of a motion for judgment as a matter of law. *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 802 (9th Cir. 2009). We view the evidence in the light most favorable to the party in whose favor the jury returned a verdict and draw all reasonable inferences in its favor. *Id.*

The verdict will be upheld if it is supported by substantial evidence, "even if it is also possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). " 'Although the court should review the record as a whole, it must disregard evidence favorable to the moving party that the jury is not required to believe, and may not substitute its view of the evidence for that of the jury.' " *Id.* (citation omitted).

**[10]** In this case, substantial evidence supports the jury's finding that the parties intended the Final Proposal to be an enforceable agreement. Michael Rubenstein, a minority owner of both the D&R Partnership and First National, and one of the negotiators of the Final Proposal on behalf of First National, testified that when Guttman learned he could not enforce an earlier version of the agreement because it was not signed, he told First National that from that point on, he wanted offers signed so that he could hold First National to them. Guttman allegedly stated: "If we're going to do anything together, I want both parties signing off [on] the document, and I want an enforceable contract now." Thereafter, Guttman sent First National an offer dated August 24, 2000 which, for the first time in the negotiations, omitted Federal Realty's theretofore standard non-binding provision. Guttman allegedly wanted language that would ensure that "there was no way either party . . . could change any of the major points in the agreement." Soon after that, the Final Proposal was signed by the executive officers of both companies.

**[11]** Dryan testified that his understanding of the "subject only to approval" clause of the Final Proposal was that "the only way that the Final Proposal can be changed or modified, or even replaced, was by agreement upon the formal agreement, and if there was no formal agreement, then we stay with the Final Proposal, which was a contract." Similarly, Rubenstein testified that the parties intended the Final Proposal to concern the major points of the contract and the "legalese and

the minor points" would be taken care of in the formal agreement.

**[12]** As soon as the Final Proposal was signed, First National held an employee meeting to announce that it had reached "an agreement with Federal Realty" and that it "would be moving before or by December 30th of 2000." Federal Realty also appears to have treated the Final Proposal as binding. Within a month of signing the Final Proposal, Federal Realty included in its internal cost reports costs for tenant buyouts, brokerage costs, and other costs for the acquisition of the Property.

**[13]** Substantial evidence also supports the jury's finding that the parties intended the put and call options in the Final Proposal to set a ground lease duration of ten years. For example, Dryan testified that the parties discussed that the lease duration would be ten years and that it was "Guttman's suggestion" to use the combination of the put and call options to set the lease duration. There was also testimony at trial that Guttman told First National that Federal Realty "would" exercise the call option at the end of the ten years if the put option was not exercised first. According to Rubenstein, "that was [Federal Realty's] insurance policy in case [First National] didn't exercise [its] put within the ten-year lease term." As the district court observed, because Federal Realty intended to put millions of dollars into the improvement of the Property, the jury was entitled to credit the above testimony and to find that the call provision assured Federal Realty that it would own the Property no later than at the end of the ten years.

**[14]** Based on the above, substantial evidence supports the jury's verdict with respect to the binding nature of the Final Proposal and the duration of the lease. Even if the jury was presented with conflicting evidence as to these issues, it was the jury's province to make any credibility determinations and to resolve any factual disputes. *See Pavao*, 307 F.3d at 918.

Accordingly, the district court did not err in denying Federal Realty's motion for judgment as a matter of law.

## C.  Damages award

[15]  With regard to the amount of damages, Federal Realty only challenges the district court's conclusion that First National could recover both lost rent *and* damages for the breach of the put option.[2] According to Federal Realty, these two awards are "irreconcilable" because: (1) by awarding damages for the full implied ten-year lease term, the court must have assumed that First National would *never* have exercised its put option, but (2) by awarding damages for the breach of the put option based on its value at the time of the breach, the district court must have assumed that First National *would* have immediately exercised its put option. Federal Realty also appears to argue that by deciding to sue immediately, First National was electing to treat the contract as repudiated, and thus should not recover for the loss of the put option.

Federal Realty's reasoning, however, is faulty. The district court never assumed that First National would have exercised its put option on the date of the breach. In fact, the district court rejected the suggestion that First National's treatment of repudiation as a breach had the effect of an exercise of the option. Instead, what the court did is *value* the put option as of the date of the breach.

Similarly, Federal Realty's argument as to the "election of remedies" is misplaced. When one party repudiates a contract, the injured party can either "treat the repudiation as an antici-

---

[2]We review de novo the legal conclusion that damages are available, *United States v. Timberland Paving & Constr. Co.*, 745 F.2d 595, 599 (9th Cir. 1984), and review for clear error the district court's factual findings in support of an award of damages, *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1347 (9th Cir. 1987).

patory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between the parties," or he can "treat the repudiation as an empty threat, wait until the time for performance arrives and exercise his remedies for actual breach if a breach does in fact occur at such time." *Taylor v. Johnston*, 15 Cal. 3d 130, 137 (1975). In this case, the district court found that First National decided to treat the repudiation as an anticipatory breach. Having done so, First National was still entitled to recover the loss of the bargain represented by the contract.

**[16]** The full benefit of the Final Proposal for First National would have been a complete ten-year lease term *followed by* a forced sale to Federal Realty. Thus, evidence at trial demonstrated that a "rational economic actor" in First National's position, seeing a virtually guaranteed 12% yield on investment, would have waited until the end of the lease to exercise the put option. This conclusion is not undercut by Dryan and Rubenstein's inability to affirmatively say at trial when they would have exercised the put option. As the district court noted, because it was Federal Realty's breach that took away First National's ability to choose when to exercise the option, Federal Realty cannot benefit from that uncertainty. *See Zinn v. Ex-Cell-O Corp.*, 24 Cal. 2d 290, 297-98 (1944); *Macken v. Martinez*, 214 Cal. App. 2d 784, 790 (1963).

**[17]** Finally, the court properly valued the option as of the date of the breach. As the court explained, the mere fact that First National would have *exercised* its option at some particular time in the future does not mean that it gets to receive the *value* as of that date. Rather, as already noted, First National was faced with a choice: (1) treat the repudiation as a breach and seek damages, or (2) wait until the time of performance. Thus, First National could have vacated the premises and waited until ten years later to exercise its option. In that case, it would have been entitled to the value of the option as of that date. By deciding instead to treat the repudiation as a breach and sue immediately, First National elected to have its

damages valued as of the date of the breach. *See Lucente v. IBM Corp.*, 310 F.3d 243, 259-63 (2d Cir. 2002) (concluding that where plaintiff decided to treat defendant's repudiation as a breach of his restricted stock and stock options, he was only entitled to damages as "measured from the date of the breach"); *Scully v. US WATS, Inc.*, 238 F.3d 497, 512-13 (3d Cir. 2001) (awarding damages as of the date of the breach and noting that an award of damages based on a prediction of what a stock's price will be in the future "would be particularly problematic" because of the amount of speculation for which it calls); *cf. Hermanowski v. Acton Corp.*, 729 F.2d 921, 922 (2d Cir. 1984) (per curiam) (concluding that where plaintiff ignored the repudiation, he was entitled to damages based on the "difference between the market value of the stock and the option price" on the date he unsuccessfully tried to invoke the option).

Accordingly, the district court did not err in awarding First National damages for both lost rent and loss of the put option, and it did not err in valuing the put option as of May 11, 2001 —the date of the breach.

## D. First National's recovery of expert witness fees

**[18]** In its separate appeal, First National argues the district court erred in following *Aceves*, 68 F.3d 1160, and applying federal law to First National's request for reimbursement of reasonable expert witness fees. We review the district court's choice of law de novo. *Id.* at 1167.

**[19]** In *Aceves*, a defendant whose offer of judgment had been rejected sought reimbursement of its expert witness fees under the applicable provision of the California offer-of-judgment statute, Cal. Civ. Proc. Code § 998(c). 68 F.3d at 1167. At the outset, the *Aceves* court noted that "[f]ederal and California offer of judgment rules differ in the level of reimbursement for expert witness costs they allow." *Id.* Whereas California allows a defendant to recover reasonable expert

witness fees in full, Cal. Civ. Proc. Code § 998(c), federal law allows a defendant to recover only forty dollars per day per witness, 28 U.S.C. § 1821(b). *Aceves*, 68 F.3d at 1167. *The Aceves* court held that "[b]ecause reimbursement of expert witnesses fees is an issue of trial procedure, . . . . federal law should control the reimbursement of expert witnesses in federal courts sitting in diversity jurisdiction." *Id.* at 1167-68. The court added that this holding was "in accord with the holdings of several other circuits." *Id.* at 1168 (citing cases from the First, Tenth, and Eleventh Circuits).

**[20]** *Aceves* is controlling here. First National is seeking reimbursement of its expert witness fees under the provision of the California offer-of-judgment statute applicable to plaintiffs, Cal. Civ. Proc. Code § 998(d). Just like in *Aceves*, "[f]ederal and California offer of judgment rules differ in the level of reimbursement for expert witness costs they allow." 68 F.3d at 1167. Whereas California allows the plaintiff to recover reasonable expert witness fees incurred, Cal. Civ. Proc. Code § 998(d), federal law allows the plaintiff to recover only forty dollars per day per witness, 28 U.S.C. § 1821(b). Indeed, the applicable federal rule is the same as it was in *Aceves* because expert witnesses in federal court are entitled to forty dollars per day *regardless* of whether they are called by the prevailing defendant or plaintiff. *See* 28 U.S.C. § 1821(b).

First National's argument that applying the federal rule in this case would lead to forum shopping is unavailing. The *Aceves* court rejected that argument with respect to 28 U.S.C. § 1821(b). *See* 68 F.3d at 1168 ("More important, we think it exceedingly unlikely that section 1821(b) provides litigants an incentive to sue in *or remove to* federal courts." (emphasis added)). First National's argument that the *Aceves* court failed to provide any basis for this conclusion is equally not persuasive. On the contrary, the *Aceves* court noted that its decision that "federal law should control the reimbursement of expert witnesses in federal courts sitting in diversity jurisdiction"

was "in accord with the holdings of several other circuits." *Id.* (citing *Chaparral Resources, Inc. v. Monsanto Co.*, 849 F.2d 1286, 1291-92 (10th Cir. 1988); *Kivi v. Nationwide Mut. Ins. Co.*, 695 F.2d 1285, 1289 (11th Cir. 1983); and *Bosse v. Litton Unit Handling Sys.*, 646 F.2d 689, 695 (1st Cir. 1981)).

**[21]** Accordingly, we affirm the district court's denial of expert witness fees calculated according to California Code of Civil Procedure § 998(d).

### III.   CONCLUSION

For the foregoing reasons, we affirm the district court's decision to allow the jury to determine whether the parties intended the Final Proposal to be a binding contract and whether they intended the put and call options in it to create a ten-year lease term. Similarly, we affirm the district court's denial of Federal Realty's motion for judgment as a matter of law; the jury's special verdict is supported by substantial evidence. We also affirm the district court's award to First National of damages for both lost rent and the value of its lost put option, and we affirm the district court's order regarding the bill of costs. Finally, because *Aceves*, 68 F.3d 1160, is controlling, we affirm the district court's denial of First National's motion for recovery of expert witness fees calculated under California Code of Civil Procedure § 998(d).

**AFFIRMED.**

**APPENDIX A**

*Final Proposal*

1.  Ground lease at $100,000 per month. Lease to include increases of three (3%) annually.

2.  First National is given a 10 year put at a capitalization rate of 9% at the then current annual rental. Federal Realty to cooperate with tax free exchange.

3.  Federal Realty to be given a call at the end of ten years at a 9% capitalization rate.

4.  First National to be offered an option to lease office space of up to 5000 square feet in the new Santana Row complex at $4.00 per square foot per month, subject to the terms and conditions of a new lease.

5.  First National to be reimbursed $75,000 to buy out the current lease holder, New Things West.

6.  Federal Realty to pay for the moving expenses of First National Mortgage not to exceed $25,000.00.

7.  Federal Realty to prepare a legal agreement for First National's review to finalize the agreement.

8.  Effective date of agreement as of date of vacating premises.

9.  The above agreement must be accepted via fax to 408-249-9214 no later than 10:00 a.m. California time on August 25, 2000, at which time this counter offer will automatically expire.

The above terms are hereby accepted by the parties subject only to approval of the terms and conditions of a formal agreement.