■ LATHAM LAND I, LLC, Appellant-Respondent , v TGI FRIDAY'S, INC, Respondent-Appellant. [948 NYS2d 147]—

Spain, J. Cross appeals from a judgment of the Supreme Court (Platkin, J.), entered February 3, 2011 in Albany County, upon a decision of the court in favor of defendant.

Plaintiff commenced this action alleging that defendant breached a May 24, 2007 contract whereby defendant, as lessee, agreed to, among other things, build and operate a restaurant on a portion of plaintiff's real property in the Town of Colonie, Albany County (hereinafter the contract). The contract contemplated an initial lease term of 10 years, with five-year renewal options and, at the end of the lease, that plaintiff would take ownership of the building. Defendant, however, never commenced construction and instead, in March 2008, notified plaintiff that it was terminating the contract. Thereafter, plaintiff commenced this action and, after failing to find another tenant, ultimately sold to a third party both the property designated to be leased to defendant and an adjacent parcel improved by a lease with Chipotle Mexican Grill of Colorado, LLC.[1] During a nonjury trial, plaintiff submitted evidence of damages based on the difference between the estimated value of the property had defendant performed under the contract, and the actual sale price that plaintiff received for the land alone.

---

1. Plaintiff sold the property to Latham Land Holdings LLC in September 2009 for $2,348,037, explicitly retaining its legal claims against defendant.

Supreme Court held that defendant had breached the contract but, finding that plaintiff had failed to establish damages, dismissed the action. The parties now cross-appeal.

We concur with Supreme Court that defendant breached the contract. The contract contemplated a time line by which the parties would simultaneously make efforts to procure the necessary approvals to proceed with the project. Specifically, plaintiff agreed to seek site plan approval at the same time that defendant would "diligently pursue" its obligation to obtain the necessary building permits. Section 2.07 (a) of the contract required defendant to submit its building plans and specifications to plaintiff for approval "no later than" 90 days after its receipt from plaintiff of, among other things, written notice that a meeting between plaintiff and the Town of Colonie's Development Coordination Committee (hereinafter DCC meeting) had occurred. After plaintiff approved its building plans, defendant then had 10 days to apply for its building permits. Although the DCC meeting occurred in July 2007, plaintiff did not then send written notice to defendant. Supreme Court found, however, that defendant had actual notice that the DCC meeting had occurred no later than the end of August 2007. Nevertheless, defendant did not submit building plans to plaintiff. By late 2007, defendant was experiencing financial difficulties and began negotiations with plaintiff to modify and postpone the contract, but the parties did not reach any new agreement and, on February 28, 2008, plaintiff sent formal written notice of the DCC meeting to defendant.

On March 24, 2008, defendant informed plaintiff that it was terminating the contract pursuant to section 2.08 (e), which provides that either party may terminate the contract if, despite the exercise of due diligence, defendant had been unable to satisfy a set of enumerated conditions—including obtaining necessary building permits—within one year from the date the contract was executed. May 24, 2008 represented the end of the one-year period and defendant terminated the lease in March 2008, two months prior to that date, arguing that plaintiff's delay in sending written notice of the DCC meeting left defendant with insufficient time within which to obtain building permits prior to the May 24, 2008 deadline.

The record amply supports Supreme Court's finding that plaintiff substantially complied with its obligation to notify defendant of the DCC meeting in August 2007, triggering defendant's obligation to submit building plans thereafter. Defendant's director of development, who was the individual who negotiated for the language regarding the DCC meeting to be included in

the contract, was copied in a series of e-mails between plaintiff and defendant in late August 2007 indicating that the DCC meeting had occurred. One of defendant's design project managers in its architectural department was also included in these e-mails. Hence, although plaintiff never sent formal written notice of the DCC meeting as set forth in the contract, the record supports the court's conclusion that defendant had actual notice by the end of August 2007. Further, evidence at trial indicated that, at defendant's urging, the parties had engaged in unsuccessful negotiations to delay defendant's performance until 2009. In addition, plaintiff submitted uncontradicted testimony that defendant made little perceivable effort to finalize building plans or apply for building permits. According appropriate deference to the trial court's credibility determinations (*see Richmor Aviation, Inc. v Sportsflight Air, Inc.*, 82 AD3d 1423, 1424 [2011]), we hold that plaintiff substantially complied with the requirements of section 2.07 (a) and that defendant thereafter breached the contract by terminating the contract rather than making diligent efforts to complete building plans and acquire permits.

Defendant contends, nevertheless, that section 2.07 (a)—"[t]enant shall submit its plans and specifications to Landlord for approval no later than ninety (90) days after (i) Landlord sends written notice"—constituted a condition precedent to its obligation to submit building plans and, as such, had to be "literally performed" as opposed to being satisfied by substantial compliance (*Oppenheimer & Co. v Oppenheim, Appel, Dixon & Co.*, 86 NY2d 685, 690 [1995]). Because plaintiff failed to send written notice until February 28, 2008, defendant argues that it had until *after* the May 24, 2008 deadline (i.e., May 28, 2008) to tender its plans, hence triggering the option to terminate the contract pursuant to section 2.08 (e) of the lease. We do not agree. "A condition precedent is 'an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises' " (*Oppenheimer & Co. v Oppenheim, Appel, Dixon & Co.*, 86 NY2d at 690, quoting Calamari and Perillo, Contracts § 11-2, at 438 [3d ed] [citations omitted]; *accord MHR Capital Partners LP v Presstek, Inc.*, 12 NY3d 640, 645 [2009]). Notably, section 2.07 (a) does not employ clearly conditional terms such as "if," "unless" or "until" (*MHR Capital Partners LP v Presstek, Inc.*, 12 NY3d at 645; *see Oppenheimer & Co. v Oppenheim, Appel, Dixon & Co.*, 86 NY2d at 691; *Restaurant Creative Concepts Mgt., LLC v Northeast Rest. Dev., LLC*, 83 AD3d 1189, 1191 [2011]; *Su Mei, Inc. v Kudo*, 302 AD2d 740, 741 [2003]). Further, read in the context of the parties' contract as a whole, it is clear that

the parties contemplated reciprocal good faith efforts to move the project forward, and this specific notice provision was intended as a means to impose a time limit on defendant's performance, rather than a basis for conditioning that performance. Thus, Supreme Court properly held that written notice of the DCC meeting was not a condition precedent to defendant's obligation to submit building plans and specifications to plaintiff, but rather that the language created a constructive condition, which could be—and was here—satisfied by substantial compliance (*see Oppenheimer & Co. v Oppenheim, Appel, Dixon & Co.*, 86 NY2d at 691; *Restaurant Creative Concepts Mgt., LLC v Northeast Rest. Dev., LLC*, 83 AD3d at 1191; *Rooney v Slomowitz*, 11 AD3d 864, 865-866 [2004]).

We turn next to the issue of damages. On appeal, plaintiff has expressly stated that it is not seeking actual rent due as a result of defendant's failure to create the leasehold estate promised by the contract. Accordingly, arguments suggesting that rent might not be recoverable because of the absence of an acceleration clause in the contract or the fact that the property was sold before the lease term began are irrelevant. Indeed, the contract was not a simple lease, but had elements of pure contract, and inasmuch as the contract was repudiated before the building was constructed or the lease term began, it was appropriate for plaintiff to seek contract damages (*see e.g. Kenford Co. v County of Erie*, 67 NY2d 257, 260 [1986]; *see also Arthur Treacher's Fish & Chips of Fairfax, Inc. v Chillum Terrace LP*, 272 Md 720, 726-731, 327 A2d 282, 286-288 [1974]). Plaintiff was thus entitled to ''recover general damages which are the natural and probable consequence of the breach'' (*Kenford Co. v County of Erie*, 73 NY2d 312, 319 [1989]). Further, we agree with Supreme Court that section 10.01 of the contract, which sets forth certain remedies—retaking possession or terminating the lease—available to plaintiff in the event of defendant's default, does not preclude plaintiff from seeking general contract damages. That section clearly contemplated a default after the lease term had begun and defendant had taken possession. Where, as here, the contract was repudiated prior to that time, the section does not preclude plaintiff from seeking alternate remedies (*see Imperial Water Co. No. 8 v Cameron*, 67 Cal App 591, 594-595, 228 P 678, 679-680 [1924]).

Hence, we turn to whether the type and measure of contract damages sought by plaintiff are appropriate. ''Damages for breach of contract include general (or direct) damages, which compensate for the value of the promised performance, and consequential damages, which are indirect and compensate for

additional losses incurred as a result of the breach" (*Appliance Giant, Inc. v Columbia 90 Assoc., LLC*, 8 AD3d 932, 934 [2004] [citations omitted]). Direct damages are typically expectation damages, measured by what it would take to put the non-breaching party in the same position that it would be in had the breaching party performed as promised under the contract (*see J.R. Loftus, Inc. v White*, 85 NY2d 874, 877 [1995]; *Simon v Electrospace Corp.*, 28 NY2d 136, 145 [1971]; Restatement [Second] of Contracts § 347). Special, or consequential damages, on the other hand, are "extraordinary in that they do not so directly flow from the breach [and] are recoverable only upon a showing that they were foreseeable and within the contemplation of the parties at the time the contract was made" (*American List Corp. v U.S. News & World Report*, 75 NY2d 38, 43 [1989]). Section 10.01 (d) of the parties' contract expressly prohibits the recovery of "any speculative, indirect, consequential, or incidental damages."

Here, plaintiff sought damages for the loss of the value of the leasehold interest promised by the parties' agreement. Specifically, plaintiff introduced evidence that the value of its property following defendant's breach was lower than it would have been had defendant honored the lease agreement, and argued that the difference in those values is a proper measure of damages in this case. Through expert testimony, plaintiff sought to establish that leased properties, such as the one at issue in this case, are often bought and sold as investment vehicles referred to as "triple net lease properties"[2] and that an accepted valuation method exists for such properties. Plaintiff's expert calculated the value of the subject property with the lease in place as $2,503,846 by dividing the average annual base rent ($162,750) by a capitalization rate of 6.5%. He then took the actual sale price of plaintiff's Colonie property ($2,348,037)—which included both the subject property and the adjacent parcel improved by the Chipotle restaurant—and subtracted the value of the portion of the property he calculated to be attributable to the Chipotle lease ($1,373,077) to arrive at the value of the portion of the demised property without defendant as a tenant—$974,960. The expert then opined that plaintiff's damages as a result of defendant's breach amounted to the difference between the value of the property with the lease in place ($2,503,846) and the value that plaintiff actually received for the sale of the property ($974,960), or $1,528,886.

---

2. In triple net lease arrangements, costs such as property taxes, insurance and maintenance are born by the lessee (*see International Trade Admin. v Rensselaer Polytechnic Inst.*, 936 F2d 744, 751 [2d Cir 1991]).

Supreme Court rejected this proof, finding that a loss, if any, in the market value of plaintiff's property on the triple net lease market is a consequential damage, specifically barred by the parties' contract. We disagree. Plaintiff seeks to recover for expectation damages flowing from defendants' breach, i.e., the loss of the benefit of its bargain. In our view, these are direct damages "which are the natural and probable consequence of the breach" (*Bi-Economy Mkt., Inc. v Harleysville Ins. Co. of N.Y.*, 10 NY3d 187, 192 [2008] [internal quotation marks and citation omitted]). Unlike losses stemming from some anticipated profit linked to, but collateral to, the parties agreement (*see e.g. Kenford Co. v County of Erie*, 73 NY2d at 319 [loss of anticipated appreciation in value of land owned in periphery of proposed stadium site are consequential damages]), the loss asserted here is the very essence of the contract between the parties—i.e., the diminution in value of the actual property defendant promised to improve and lease (*see e.g. NENR Invs., LLC v Starbucks Corp.*, 2009 WL 1605603, 2009 US Dist LEXIS 47999 [WD Va 2009]). Further, unlike lost profits which must both be proven with reasonable certainty and shown to have been "fairly within the contemplation of the parties to the contract at the time it was made" (*see Kenford Co. v County of Erie*, 67 NY2d at 261), here, the value of the lease was calculated based upon the rental amounts specifically contemplated by the parties' agreement (*see American List Corp. v U.S. News & World Report*, 75 NY2d at 43). Although the calculation of these general damages by using values obtained from the triple net lease market may be challenged, with contrary proof, as inaccurate or not a proper measure of the actual value of plaintiff's land, the use of this particular methodology to assess the damage amount does not alter the core nature of the damages sought—the lost value of the lease—as being direct damages flowing from the breach.

Thus, contrary to defendant's arguments, plaintiff did not need to demonstrate that, at the time the contract was signed, plaintiff planned to sell the subject property in the triple net lease market and that defendant was aware of that plan. In light of defendant's breach, and plaintiff's failed efforts to find a new tenant for the property, the sale of the property was an appropriate effort to mitigate damages (*see First Natl. Mtge. Co. v Federal Realty Inv. Trust*, 633 F Supp 2d 985, 993 [ND Cal 2009], *affd* 631 F3d 1058 [9th Cir 2011]). Plaintiff is not seeking a loss of profits on the triple net market, but rather using that market to illustrate the loss of value directly caused by defendant's breach.

However, because defendant challenged several aspects of

plaintiff's methodology, including the appropriate amount of the sale price attributable to the Chipotle lease, we must remit the matter to Supreme Court for its findings on actual damages. Further, in light of our holding, plaintiff may be entitled to counsel fees pursuant to section 16.12 of the contract.

Lahtinen, P.J., Malone Jr., Kavanagh and McCarthy, JJ., concur. Ordered that the judgment is modified, on the law and the facts, without costs, by reversing so much thereof as found that plaintiff is not entitled to damages, costs or counsel fees; matter remitted to the Supreme Court for further proceedings not inconsistent with this Court's decision; and, as so modified, affirmed.