**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 10-1384**

HELMUT F. PORKERT,

              Plaintiff - Appellant,

         v.

CHEVRON CORPORATION, a Delaware corporation,

              Defendant - Appellee.

Appeal from the United States District Court for the District of
South Carolina, at Beaufort.  Sol Blatt, Jr., Senior District
Judge.  (9:07-cv-03940-SB)

Argued:  December 8, 2011              Decided:  January 12, 2012

Before WILKINSON, KING, and KEENAN, Circuit Judges.

Affirmed by unpublished opinion.  Judge Keenan wrote the
opinion, in which Judge Wilkinson and Judge King joined.

**ARGUED:** Sean Michael Bolchoz, HALE & BOLCHOZ, LLC, Hilton Head
Island, South Carolina, for Appellant.  Lewis Joseph Loveland,
Jr., KING & SPALDING, LLP, Atlanta, Georgia, for Appellee.  **ON
BRIEF:** Bryson M. Geer, NELSON MULLINS RILEY & SCARBOROUGH, LLP,
Charleston, South Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

BARBARA MILANO KEENAN, Circuit Judge:

In this breach of contract action, we consider whether the district court erred in granting summary judgment in favor of the defendant, Chevron Corporation (Chevron), on a complaint filed by a former Chevron employee, Helmut Porkert, contesting the expiration of certain stock options. The issues presented are: 1) whether the district court correctly determined that Porkert failed to exercise his stock options within the applicable time period; and 2) whether there were genuine issues of material fact relating to Porkert's employment agreement or stock option grants that precluded the district court from awarding summary judgment. Upon our review, we affirm the district court's judgment.


I.

Because this appeal arises from the district court's award of summary judgment, we present the facts in the light most favorable to Porkert, the non-moving party. See Henry v. Purnell, 652 F.3d 524, 527 (4th Cir. 2011) (en banc). The

2

record before us shows[1] that Porkert and Chevron entered into negotiations in 1999 to employ Porkert as Chevron's new Chief Procurement Officer. In the negotiations with Porkert, Chevron was represented by its former Vice Chairman, David O'Reilly, and former Chief Financial Officer, Martin Klitten. Several draft terms of employment were considered by the parties, which covered matters such as Porkert's salary, benefits, signing bonus, and stock options.

From the outset of the negotiations, Porkert indicated that because he was 59 years old, he would not accept a position that required a lengthy period of employment before he became vested in Chevron's retirement plan. In May 1999, Porkert received a letter from Chevron proposing certain terms of employment (the May 1999 letter), which included a provision regarding his eligibility for stock options under Chevron's "Long-Term Incentive Plan" (LTIP). With regard to stock options, the May 1999 letter provided:

> IV. Long-Term Incentive Plan
>
> Non-qualified stock options and Performance Units awarded annually to E-1s under the

[1] In addition to certain documents in the record, the parties largely rely on Porkert's deposition testimony to establish the facts underlying his claims.

3

> terms of the Long-Term Incentive Plan. This
> amount may vary from year-to-year. In 1998,
> E-1s were awarded 8,000 non-qualified stock
> options (ten year term) and 1,700
> Performance Units.

(Emphasis added.) Because Porkert did not agree to all the terms of the May 1999 letter, the parties continued to negotiate to find acceptable terms for Porkert's employment.

In June 1999, Klitten sent Porkert a letter by facsimile, which was signed by O'Reilly on behalf of Chevron (June 1999 letter). The June 1999 letter also addressed the terms of Porkert's employment, including his annual compensation, signing bonus, benefits, terms of severance, and a provision regarding his eligibility for stock options under the terms of the LTIP, which was virtually identical to the stock option provision contained in the May 1999 letter. Although Chevron contends that the June 1999 letter embodied the final terms of Porkert's employment, we assume for summary judgment purposes, as argued by Porkert, that the parties agreed upon the final terms of his employment in a later agreement.

Porkert testified that in a final version of his employment agreement, later in June 1999, it was agreed that he would be fully vested in the retirement plan after two years' employment with Chevron, and that he could exercise stock options for up to ten years from the date he received them. Porkert did not

4

receive a copy of this final written agreement, and neither the agreement, nor any documentation relating to the agreement, is contained in the record before us.

Porkert began working as Chief Procurement Officer of Chevron on July 15, 1999. In August 1999, he received a letter from Chevron regarding his eligibility for stock option grants under the LTIP (the August 1999 letter). The August 1999 letter identified as attachments and enclosures the full plan documents comprising the LTIP, and also provided a website link through which Porkert could obtain access to the plan documents. Porkert testified that he did not remember reading the attachments or enclosures to the August 1999 letter, and that he was preoccupied with his work at the time.

The LTIP rules included a provision regarding the effect of an employee's retirement on the right to exercise vested stock options. In addition to the circumstance of an employee's retirement, the provision also addressed the event of an employee's termination, death, or disability (the LTIP termination rule).[2] The LTIP termination rule provided, in relevant part, as follows:

---

[2] A materially-identical provision was contained in the 2002 and later versions of the Chevron LTIP.

5

D. Effect of Termination of Employment

> 1. Upon termination of employment for reasons other than death, Disability or termination of employment at or after Eligibility for Retiree Welfare Benefits or at age 65 pursuant to the Corporation's mandatory retirement policy, <u>vested options may be exercised within three months from the date of termination (but in no case later than ten years from the date of grant)</u>. However, if the optionee has engaged in Misconduct, all options are canceled effective as of the time of termination of employment.

(Emphasis added.)

Porkert was 64 years old when he retired from Chevron, and he does not argue that his employment was terminated under circumstances falling within the above exceptions to the LTIP termination rule, namely, "death," "[d]isability," termination after "[e]ligibility for [r]etiree [w]elfare [b]enefits," or termination "at age 65 pursuant to the Corporation's mandatory retirement policy." As a result, the terms of the LTIP applicable to Porkert provided that Porkert's "vested options may be exercised within three months from the date of termination (but in no case later than ten years from the date of grant)."

From 1999 through 2004, during each year of Porkert's employment at Chevron, he received annual stock option grants under the LTIP. Beginning in 1999 through 2001, Porkert

6

accepted and signed each stock option grant, as required by the terms of those grants. Porkert also accepted stock option grants annually, from 2002 until 2004, even though these grants did not require his signature.

All stock option grants were subject to the LTIP and its rules, and contained specific language to that effect. While Porkert understood that the LTIP and its rules were incorporated into the stock option grants and were available upon request, he did not read those documents because he "didn't have time for that."

Porkert worked as Chevron's Chief Procurement Officer until his retirement on February 15, 2005. As of that date, almost 72,000 of Porkert's 110,000 stock options were vested. However, Porkert did not attempt to exercise any of his options until May 2007. At that time, he was informed that all 110,000 of his stock options[3] had been cancelled by Chevron three months after his retirement.

---

[3] This figure excludes the stock options Porkert received as a signing bonus that he was able to exercise in May 2007. The stock option agreement under which these stock options were granted expressly provided that "[a]t termination, the vested shares under this Grant will be exercisable for the remainder of the 10-year term." The stock option agreements at issue in this case do not include similar language.

After attempting to resolve this issue directly with Chevron, Porkert filed suit in a South Carolina state court, asserting claims including breach of contract and promissory estoppel. After Chevron filed a notice of removal, the case was removed to the district court.

In the district court, Chevron moved for summary judgment. The district court requested additional briefing on the breach of contract claim, but granted summary judgment to Chevron on the remaining claims. The district court later granted summary judgment to Chevron on the breach of contract claim, holding that Porkert failed to exercise his stock options within three months of his retirement as required under the LTIP and its rules. The district court held that, even assuming Porkert and Chevron reached an express employment agreement as described by Porkert, the stock option grants effectively modified that original agreement because Porkert agreed to the terms of the LTIP incorporated in each grant. After the district court denied his request for reconsideration, Porkert filed this appeal.

II.

We review de novo the district court's award of summary judgment. S.C. Green Party v. S.C. State Election Comm'n, 612

8

F.3d 752, 755 (4th Cir. 2010). We view the facts, and all reasonable inferences that may be drawn from those facts, in the light most favorable to the non-moving party. Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011). Summary judgment is appropriate only when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

We begin by considering the language of the termination provision to determine whether the LTIP termination rule required that Porkert's vested stock options be exercised within three months of his retirement. As set forth above, this termination rule stated that "vested options may be exercised within three months from the date of termination (but in no case later than ten years from the date of grant)."[4] (Emphasis added.) Porkert argues that the word "may" in this provision is used as a "permissive term," rather than as a "mandatory term." He further contends that this language in the LTIP termination

_____

[4] The termination rule included in the LTIP terms in 2002 and later years similarly provided that under such circumstances of termination, "vested Stock Options may be exercised within 90 days from the date of termination (but in no case later than ten years from the date of grant)." (Emphasis added.)

9

rule was ambiguous and, therefore, should have been construed against the drafter, Chevron, to the effect that vested stock options could have been exercised outside the stated three-month window. We disagree with this argument.

Under California law,[5] the interpretation of a contract presents an issue of law when the language of the contract is unambiguous. See F.B.T. Prods., LLC v. Aftermath Records, 621 F.3d 958, 963-64 (9th Cir. 2010) (citing City of Hope Nat'l Med. Ctr. v. Genentech, Inc., 181 P.3d 142, 156 (Cal. 2008)). Any interpretation of a contract that effectively reads a word or clause out of the contract must be avoided whenever possible. See Cal. Civ. Code § 1641. Courts interpreting a contract are instructed to "give significance to every word of a contract, when possible, and [to] avoid an interpretation that renders a word surplusage." In re Tobacco Cases I, 111 Cal. Rptr. 3d 313, 318 (Cal. Ct. App. 2010); see also Transp. Guar. Co. v. Jellins, 174 P.2d 625, 628 (Cal. 1946).

We conclude that Porkert's proposed construction of the LTIP termination rule, permitting stock options to be exercised

---

[5] The parties do not dispute that California law governs issues concerning the existence, modification, or interpretation of the LTIP, its rules, and all stock option agreements at issue in this case.

both within three months of his date of termination as well as outside that three-month window, would render the clause mere surplusage.  Thus, we decline to give this contractual language such an implausible interpretation.  To the extent that Porkert sought to exercise his vested stock options following the termination of his employment, the plain language of the LTIP termination rule required that it be done "within three months from the date of termination (but in no case later than ten years from the date of grant)."[6]

We next consider Porkert's contention that there were genuine issues of material fact relating to the terms of his final employment agreement, which precluded the district court from granting summary judgment to Chevron.  Porkert argues that irrespective whether the LTIP termination rule applied, the final version of his employment agreement provided that he would become fully vested in Chevron's retirement plan after two years' employment, and could exercise his stock options for up to ten years after issuance regardless of his retirement date.

---

[6] The use of the word "may" in the LTIP termination rule is permissive to the extent that Porkert was not required to exercise his stock options, but could have let them lapse after termination of his employment if, for example, he found it financially impracticable to exercise them.

In considering this argument, we reiterate that the district court assumed the veracity and accuracy of Porkert's alleged final employment agreement in reaching its decision. We likewise accord Porkert's allegations this same status. Thus, Porkert's arguments concerning the terms of his employment agreement do not, without more, raise any issue of material fact that would preclude summary judgment, because those facts already have been viewed in Porkert's favor.

We therefore turn to address the district court's analysis whether the stock option grants under the LTIP were modifications of Porkert's final employment agreement. Porkert argues that the issues whether the stock option grants were modifications of his final employment agreement, and whether adequate consideration supported any such modifications, were issues of material fact that should have been submitted to a jury. Porkert also contends that the stock option grants could not have modified his final employment agreement, because a valid modification requires several contractual elements that were lacking in this case. First, according to Porkert, there was no "meeting of the minds" regarding the particular LTIP term that vested stock options had to be exercised within three months of his retirement because, under his employment agreement, he was allowed ten years to exercise vested stock

12

options.  Second, Porkert argues that the adequacy of consideration presented a question of material fact for the jury.  Third, Porkert contends that because he already was entitled to receive stock options under his final employment agreement, his later receipt of stock options could not constitute "new consideration" supporting a modification.

We address each of Porkert's arguments in turn under applicable principles of California law.  Under California law, a written contract may be modified by another written contract. Cal. Civ. Code § 1698(a).  The valid modification of a written contract must satisfy the same criteria essential to the formation of the original contract, including offer and acceptance, or mutual assent, and adequate consideration.  See Am. Bldg. Maint. Co. v. Indem. Ins. Co. of N. Am., 7 P.2d 305, 307 (Cal. 1932).  California law does not require that a court weigh "the quantum of benefit received by a promisor or of the detriment suffered by a promisee where the consideration is plainly substantial."  Winkelman v. City of Tiburon, 108 Cal. Rptr. 415, 422 (Cal. Ct. App. 1973).  Further, in the context of stock option agreements, California law provides that "[i]n cases involving employee benefits, such as pension plans and stock options, the rule has developed that the offer of such bonuses constitutes an offer for a unilateral contract, which is

13

accepted if the employee continues in employment after the offer." DiGiacinto v. Ameriko-Omserv Corp., 69 Cal. Rptr. 2d 300, 303 (Cal. Ct. App. 1997) (emphasis added). Simply put, "[c]onsideration is inherent where stock options are granted to employees and the employee continues employment knowing of the options." Id. at 303-04 (quoting Newberger v. Rifkind, 104 Cal. Rptr. 663, 665 (Cal. Ct. App. 1972)). In some instances, the adequacy of consideration may be a question of fact for the jury, but when the facts underlying the purported consideration are uncontested, a court may find consideration adequate as a matter of law. See In re Southland Supply, Inc., 657 F.2d 1076, 1081 (9th Cir. 1981); Garcia v. World Savings, FSB, 107 Cal. Rptr. 3d 683, 690-91 (Cal. Ct. App. 2010).

We find no merit in Porkert's contention that the parties did not reach a "meeting of the minds" regarding the particular LTIP term that his vested stock options had to be exercised within three months of his retirement. Porkert unequivocally accepted each stock option grant on an annual basis from 1999 until 2004, and did so knowing that each grant was expressly governed by the LTIP terms and rules. Indeed, Porkert admits that he "naturally assumed" that his stock options were issued pursuant to the LTIP. At all times relevant to this dispute, the LTIP terms and rules required that in the circumstances

14

under which Porkert left Chevron's employ, Porkert was required to exercise his vested stock options within the lesser of three months from the date of termination, or ten years from the date the options were granted. Thus, in effect, Porkert's argument that the parties did not reach a "meeting of the minds" is based on nothing more than the fact that Porkert did not read the LTIP terms that governed his stock option grants. Manifestly, "one who assents to a contract is bound by its provisions," irrespective whether one reads them. Madden v. Kaiser Found. Hosps., 552 P.2d 1178, 1185 (Cal. 1976).

Second, we reject Porkert's argument that the issue of adequacy of consideration presented a genuine issue of material fact. There is no dispute that, from 1999 until 2004, Porkert annually accepted each stock option grant subject to the terms of the LTIP, that he understood the grants were governed by the terms of the LTIP, and that he continued his employment with Chevron knowing of such grants. Thus, under California law, we may determine the adequacy of consideration as a matter of law. See In re Southland Supply, 657 F.2d at 1081; Garcia, 107 Cal. Rptr. 3d at 690-91.

Third, we find no merit in Porkert's argument that because he was entitled to stock options as part of his employment contract with Chevron, the stock option grants were not "new

15

consideration" sufficient to support the modification of a contract. As we already have stated, in cases of stock options, the rule in California is that consideration is inherent when stock options are granted to an employee who continues in that employment with knowledge of that stock option grant. DiGiacinto, 69 Cal. Rptr. 2d at 303. Thus, because Porkert unambiguously accepted grants for specific and substantial numbers of stock options knowing that they were governed by the LTIP, and because Porkert continued his employment with Chevron thereafter, he cannot argue that the stock option grants lacked the consideration necessary to modify his prior employment agreement. See id. Accordingly, we conclude that the stock option grants modified any prior agreement to the contrary, and that Porkert only was permitted to exercise his stock options within three months of his retirement date.

Finally, we disagree with Porkert's contention that the district court erred in granting summary judgment to Chevron on his promissory estoppel claim. Under California law, when the parties have entered into a written contract, a claim arising under it is one for breach of contract and may not be asserted on the separate ground of promissory estoppel. See Kliff v. Hewlett Packard Co., Inc., 318 F. App'x 472, 477 (9th Cir. 2008) (citing Youngman v. Nevada Irr. Dist., 449 P.2d 462, 469 (Cal.

16

1969)).  Pursuant to Porkert's testimony and his argument before the district court, he entered into a final written employment agreement with Chevron in June 1999, which established the contractual rights he asks us to enforce on appeal.  Therefore, because Porkert claims that Chevron breached a written contract, his claim of promissory estoppel based on those same contractual terms is barred under California law, and the district court did not err in granting summary judgment in favor of Chevron on the promissory estoppel claim.[7]  Accord Kajima/Ray Wilson v. Los Angeles Cnty. Metro. Transp. Auth., 1 P.3d 63, 69 (Cal. 2000) (promissory estoppel developed for circumstances when "a party lacking contractual protection relied on another's promise to its detriment").

## III.

For these reasons, we affirm the district court's judgment.

AFFIRMED

---

[7] Although the district court disposed of the promissory estoppel claim on the different ground that Porkert had not shown the reasonable reliance element of promissory estoppel, the district court's analysis does not alter the result we reach here.  See Cochran v. Morris, 73 F.3d 1310, 1315 (4th Cir. 1996) (en banc) (district court judgment may be affirmed on other grounds).

17